[Cite as *State v. Carter*, 2010-Ohio-5189.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                     CASE NO. 1-10-01

    v.

MARKELUS Q. CARTER,                   O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2009 0068

Judgment Affirmed

Date of Decision:    October 25, 2010

APPEARANCES:

    *Spencer Cahoon* for Appellant

    *Jana E. Emerick* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Markelus Q. Carter, appeals the judgment of the Court of Common Pleas of Allen County convicting him of possessing a weapon while under disability and possession of crack cocaine, and sentencing him to a four-year prison term. On appeal, Carter contends that the trial court erred when it refused to suppress statements he made to police officers prior to being given Miranda warnings. Based upon the following, we affirm the judgment of the trial court.

{¶2} In April 2009, the Allen County Grand Jury indicted Carter on Count One, having a weapon while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree; Count Two, having a weapon while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree; and, Count Three, possession of crack cocaine in violation of R.C. 2925.11(A),(C)(4)(d), a felony of the second degree. The indictment was issued following a search of Carter's residence which revealed the presence of a weapon and crack cocaine. The bases of the search warrant for the residence were statements Carter made during a police interview concerning an unrelated homicide.

{¶3} In May 2009, Carter filed a motion to suppress the evidence seized during the search of his residence, arguing that the stop of his vehicle prior to the

interview was unsupported by reasonable and articulable suspicion and without a warrant. Further, Carter contended that his interview was custodial, because he did not have an objective and reasonable belief that he was free to leave, and that the interview was not preceded by Miranda warnings.

{¶4} In July 2009, the trial court held a hearing on the motion to suppress, at which the following testimony was heard.

{¶5} Sergeant Charles Godfrey, a police officer for the city of Lima, testified that, on February 23, 2009, he began to investigate the homicide of Kenneth Warrington, the boyfriend of Sonya Burkholder; that he had worked on a recent case involving Carter and Burkholder, who was the mother of Carter's children; that, due to their relationship, Carter was a person of interest in the homicide; that he called Carter's cell phone at approximately 7:58 a.m. and asked him to come to the police station to talk, and Carter agreed; that he waited approximately half an hour and then called Carter again to ask him to come to the station and told him that it was "important" and "that something had happened to Kenneth" (motion to suppress hearing tr., vol. I, p. 5); that Carter agreed to come to the station within the hour; that, when Carter did not arrive, he broadcast a description of Carter's vehicle and license plate number to other law enforcement officers and requested they locate him; that Carter arrived at the police station around 9:30 a.m.; that the officers drove him to the station, but that he believed

Carter came on his own volition; that Carter spoke to him and Detective Kleman; that Carter was calm at that point, but voiced concerns about his daughter; and, that he was not sure why Carter became concerned about his daughter and explained to Carter that she was fine.

{¶6} Detective Timothy Clark of the Lima Police Department testified that, upon speaking to Sergeant Godfrey at 8:30 a.m., he drove to Carter's home; that he observed a man working on a vehicle and confirmed the man was Carter by speaking with Sergeant Leary, who was also in the area; that he observed the front license plate of the vehicle was different from the rear license plate; that the man got into the vehicle and began to drive away; that Sergeant Leary and several other officers executed a stop of the vehicle; that he advised the officers that Carter was not under arrest, but that he just needed to talk to Carter; that he informed Carter there had been a homicide that morning that they were investigating, and Carter became "extremely emotional," began screaming and flailing, threw himself on the ground, and began talking about his daughter having been injured (id. at 19); that he did not know why Carter believed his daughter had been injured and assured him several times that his daughter was fine; that, due to Carter being "emotionally out of control," he was not comfortable with him driving his own vehicle to the police station or riding to the police station in the passenger seat of his cruiser (id. at 20); that Carter got into the back of a patrol car on his own and

the officers escorted him to the station; and, that he impounded Carter's vehicle because it was blocking a driveway, was close to a busy intersection, and had improper registration.

{¶7} Detective Clark continued that Carter was not handcuffed when he arrived at the station, and that he did not remember whether Carter handed him the keys to his vehicle or whether they were still in the car when he impounded it.

{¶8} Detective Phillip Kleman of the Lima Police Department testified that Carter was brought into the station for a "non-custodial" interview in conjunction with the homicide (id. at 35); that, by "non-custodial," he meant that Carter was not under arrest and was free to go; that he and Sergeant Godfrey were the only officers present during the interview; that the interview lasted approximately two hours; that, for most of the interview, Carter was very calm, with the exception of the last several minutes, during which he "wasn't very happy" (id. at 36); that the interview was very "laid back" and "relaxed" (id.); that the door to the interview room was not locked; that Carter had access to his cell phone during the interview and used it several times; that they had a "general conversation" (id.); that they discussed what Carter was going to be doing after the interview concluded; that Carter would not have been permitted to have his cell phone if it were a custodial interview; that one of the calls Carter made was to his attorney, Kenneth Rexford; that he also spoke with Rexford, and nothing was

discussed insinuating that it was a custodial interview; and, that, after the interview concluded, Carter was taken to the front door of the station where his friend picked him up.

{¶9} Thereafter, the State introduced as evidence an audio and video recording of the interview between Sergeant Godfrey, Detective Kleman, and Carter. The recording reveals that no more than two officers were ever present in the interview room with Carter; that the door to the interview room was closed when both officers were in the room; that Sergeant Godfrey informed Carter that "when we're done you can get on going home"; that the officers and Carter discussed what his plans were for the afternoon; that, approximately twelve minutes into the interview, Carter admitted he kept a firearm in his residence; that Carter used his cell phone to ask a friend to pick him up from the station; that, while speaking on his cell phone when no officers were present in the interview room, Carter stated he "want[s] out of here"; that Carter informed the officers that his "ride" had arrived, and Sergeant Godfrey replied, "if you're willing, let them take off [and] I'll give you a ride wherever you need to go when we're done"; that, approximately twelve minutes before the interview concluded, Carter stated "I'm ready to be let go"; and, that Carter appeared calm until approximately fifteen minutes before the interview concluded, when he appeared agitated and began to raise his voice.

{¶10} Thereafter, Detective Scott Leland of the Lima Police Department testified that he drafted several search warrants in conjunction with the homicide investigation, which were signed by the trial court judge and executed; that one of the search warrants was for Carter's residence; and, that the basis of the first search warrant was Carter's statement during his interview at the station that he was in possession of a firearm despite being under disability due to a prior conviction.

{¶11} Rexford testified that he was an attorney who had represented Carter on several occasions; that, on the day in question, he spoke with Carter three separate times; that, during the first call, he received the impression that the interview was a "follow up" of a previous case; that, during the second call, Carter's demeanor was unintelligible and hysterical, and he was crying and rambling about something happening to his daughter; that he learned that Carter was at the police station; that he spoke to an unidentified officer who told him they were speaking to Carter, and, regarding his daughter, they were "gonna explain that to him" (id. at 51); that he received the impression that something had happened to Carter's daughter and that was why he had been contacted by the police; that there was no indication that any type of criminal conduct was at issue; that, during the third call, he learned that Carter was at the police station allegedly being interrogated; that he then talked to Carter, gave him directives, and told him

about his rights; and, that he then spoke to Detective Kleman and indicated to him to "cease all communications at this point * * * as far as the interrogation was concerned." (Id. at 58).

{¶12} On cross-examination, Rexford stated that, during the third phone call, Detective Kleman indicated to him that Carter was free to leave; that he believed the officers he spoke to during the phone calls were untruthful in telling him that Carter was there voluntarily and was free to go, and in suggesting that Carter was at the police station because something had happened to his daughter. Thereafter, on redirect, Rexford clarified his prior statement by explaining that he believed it was very possible the officers he spoke to did not know or had been misinformed about the pretenses under which Carter was taken to the police station.

{¶13} Carter testified that, on February 23, 2009, Sergeant Godfrey contacted him just prior to 8:00 a.m. and requested that he come to the police department to speak with him; that he believed the call was in conjunction with a prior case concerning a child support action filed by his children's mother; that he told Sergeant Godfrey he had work to finish, and would go to the station after he was done; that Sergeant Godfrey called him again, and his tone was "more intense" about Carter coming to the police station (motion to suppress hearing tr., vol. II, p. 19); that he asked Sergeant Godfrey what the discussion was for, and he

informed him that "something happened to Ken" (id. at 20); that he believed "Ken" referred to his attorney, Rexford; that, shortly thereafter, he was pulled over by a uniformed officer who patted him down and requested his identification; that Detective Clark approached him and told him he wanted to speak to him about a murder on McKibben Street; that, because Burkholder, his daughter's mother, lived on McKibben Street, he asked "where's my daughter?" (id. at 25); that Detective Clark responded "I can't answer that" (id.); that he believed something had happened to his daughter; that he was very emotional and was running around, jumping, screaming, crying, and fell to the ground; that he was "directed," uncuffed, to the back of a police car to be taken to the station; that he tried to call several people while in the police car on the way to the station, but could not make contact with anyone except Rexford; that he was interviewed by Detective Kleman upon arriving at the station; that he inquired multiple times about his daughter, and the Detective replied "well, she's okay," but also advised that the officers had her cell phone (id. at 32); and, that, because the officers had his daughter's phone, he remained under the impression that something had happened to her.

{¶14} On cross-examination, Carter testified that he knew that Warrington, the homicide victim, had a relationship with Burkholder; that the police officers gave him his cell phone while in the interview room and allowed him to make calls; that he believed the officers abused him mentally because they did not give

him a "straight" answer about his daughter; that he never heard Detective Clark tell him that his daughter was okay prior to being transported to the police station; and, that, at no point, did any officer inform him that his daughter had been injured.

{¶15} In August 2009, the trial court denied Carter's motion to suppress. In its very thorough, twelve-page entry, the trial court found that the stop of Carter's vehicle was lawful because it had two different license plates; and, alternately, because the officers were making a reasonable stop of a potential witness to a crime. Additionally, the trial court found that Carter voluntarily went to the police station; that he was calm, coherent, and apparently understanding of the officer's questions; that, although he was never officially admonished of his Miranda rights, the DVD of the interview demonstrated that Carter informed Sergeant Godfrey that his attorney had advised him of his rights; that Carter was not threatened or promised anything for his statement; and, that Carter had the opportunity to consult with his attorney while at the police station. Accordingly, the trial court ascertained that Carter was never in custody, and, thus, Miranda warnings were not required. The trial court further found that there was no credible evidence that Rexford told the officers to cease the interrogation, and that Carter was allowed to leave after the interview concluded. The trial court

concluded that the search warrants were not based on illegally obtained evidence, and overruled Carter's motion to suppress.

{¶16} In November 2009, the case proceeded to jury trial. Thereafter, the jury found Carter guilty of Count One, not guilty of Count Two, and guilty of Count Three.

{¶17} In December 2009, the trial court sentenced Carter to a one-year prison term on Count One, and to a mandatory three-year prison term on Count Three, to be served consecutively. Further, the trial court ordered Carter to pay a $15,000 fine in conjunction with Count Three.

{¶18} It is from this judgment that Carter appeals, presenting the following assignment of error for our review.

> **THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DID NOT SUPPRESS MR. CARTER'S NON-MIRANDIZED STATEMENTS AND THE FRUITS THEREOF, DESPITE THE FACT THAT MR. CARTER WAS QUESTIONED BY MULTIPLE POLICE OFFICERS IN AN INTERROGATION ROOM, WAS TOLD THAT HE COULD LEAVE <u>AFTER</u> THE POLICE WERE DONE QUESTIONING HIM, AND HAD NO WAY TO LEAVE EARLIER SINCE THE POLICE HAD IMPOUNDED HIS VEHICLE AND TAKEN HIS KEYS. (JUDGMENT ENTRY MOTION TO SUPPRESS, AUG. 25, 2009); ST.EX. 4, 0:00:25-27; MOTION TO SUPPRESS HEARING, JULY 9, 2009, AT 32-33; SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION; THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

(Emphasis sic.)

{¶19} In his sole assignment of error, Carter contends that the trial court erred when it refused to suppress his non-mirandized statements and the fruits thereof. Specifically, Carter argues that the trial court should have suppressed his statements and the fruits thereof because, under the totality of the circumstances surrounding his interview, he was in custody or deprived of his freedom of action in a significant way. Carter specifies that the officers insinuated his daughter had been injured; that the officers retained his keys and impounded his vehicle; that the interview lasted approximately two hours; that the interrogation room was coercive due to its small size and because he was seated in the back corner without unobstructed access to the door; and, that he was never informed of his right to terminate the encounter.

{¶20} "Appellate review of a decision on a motion to suppress evidence presents mixed questions of law and fact." *State v. Dudli*, 3d Dist. No. 3-05-13, 2006-Ohio-601, ¶12, citing *United States v. Martinez* (C.A.11, 1992), 949 F.2d 1117. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson* (2000), 137 Ohio App.3d 847, 850. Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶100, citing *State*

*v. Fanning (*1982), 1 Ohio St.3d 19, 20.  The appellate court must then review the application of the law to the facts de novo.  *Roberts*, supra, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8.

**{¶21}** It is well-established that Miranda warnings are not required in nonthreatening and nonconfining interrogation situations, which are noncustodial in nature.  *State v. Greeno*, 3d Dist. No. 13-02-46, 2003-Ohio-3687, ¶12, citing *State v. Mason* (1998), 82 Ohio St.3d 144, 153; *Oregon v. Mathiason* (1977), 429 U.S. 492, 494.  This is so because "[i]t is the coercive nature of custodial interrogation that necessitates the Miranda warnings[.]"  Id.

**{¶22}** In determining whether an interrogation is custodial, courts must inquire into "'how a reasonable man in the suspect's position would have understood his situation.'"  *Mason*, 82 Ohio St.3d at 154, quoting *Berkemer v. McCarty* (1984), 468 U.S. 420, 442.  The Supreme Court of Ohio has directed that, "[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'"  *State v. Gumm*, 73 Ohio St.3d 413, 429, 1995-Ohio-24, quoting *United States v. Mendenhall* (1980), 446 U.S. 544, 554.

**{¶23}** This Court has previously found the following factors relevant in determining whether a reasonable person would have believed he was free to leave:

**(1)  What was the location where the questioning took place-i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station;**
**(2)  Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);**
**(3)  Was the defendant's freedom to leave restricted in any way;**
**(4)  Was the defendant handcuffed or told he was under arrest;**
**(5)  Were threats made during the interrogation;**
**(6)  Was the defendant physically intimidated during the interrogation;**
**(7)  Did the police verbally dominate the interrogation;**
**(8)  What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning;**
**(9)  Were neutral parties present at any point during the questioning;**
**(10) Did police take any action to overpower, trick, or coerce the defendant into making a statement?**

*State v. Luke*, 3d Dist. No. 1-06-103, 2007-Ohio-5906, ¶11, quoting *Greeno*, 2003-Ohio-3687, at ¶15, citing *State v. Estepp*, 2d Dist. No. 16279, 1997 WL 736501. Further, this Court has emphasized that, "'[t]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *State v. Ransom*, 3d Dist. No. 15-06-05, 2006-Ohio-6490, ¶20, quoting *Mason*, 82 Ohio St.3d at 154, quoting *California v. Beheler* (1983), 463 U.S. 1121, 1125.

{¶24} Here, Carter essentially argues that he was tricked in going to the police station and participating in the interview by the officers' statements that, he argues, insinuated his daughter had been injured. However, Sergeant Godfrey testified he did not know what had aroused Carter's concerns, and that he explained to him that his daughter was fine. Further, Detective Clark testified that he assured Carter several times that his daughter was fine prior to Carter travelling to the police station. Even Carter admitted that no one told him that his daughter had been injured and that Detective Kleman told him his daughter was okay. Additionally, we note that, despite Carter's argument that he was not free to leave because the police had impounded his vehicle, he had possession and use of his cell phone and did, in fact, contact a friend who picked him up from the police station.

{¶25} Additionally, Carter argues that Sergeant Godfrey's statement that "when we're done you can get on going home" indicated that he was not free to leave until the officers were done questioning him. We cannot find that this statement made at the beginning of the interview, in a casual manner, would cause a reasonable person to believe he was not free to leave given the other circumstances of the interview. Specifically, evidence was heard that Carter voluntarily got into the police cruiser to be escorted to the station; that the officers did not feel comfortable with Carter driving himself to the police station because

he was "emotionally out of control"; that Carter was not handcuffed; that Carter's vehicle was impounded because it was blocking a driveway, was close to a busy intersection, and had improper registration; that no more than two officers were present during the interview; that the door to the interview room was closed at times, but unlocked; that the interview was "laid back" and "relaxed" and Carter was calm for most of the interview; that the interview was a "general conversation"; that Carter had access to his cell phone and used it several times during the interview, including to consult with his attorney; and, that Carter would not have been permitted to access his cell phone if the interview had been custodial. Additionally, although Carter stated on the recording of the interview that he "want[s] out of here," he did not make this statement when any officers were present in the room, or make a similar demand when they returned. Further, although Carter stated on the recording of the interview that he was "ready to be let go," he made no attempt to leave at that point, did not ask the officers if he could leave, and, in fact, continued to answer their questions until he departed approximately twelve minutes thereafter. Finally, Carter made the statement that he was "ready to be let go" long after he revealed to the officers that he had a firearm in his residence.

{¶26} We acknowledge that the interview was approximately two hours in duration; that the officers did not inform Carter that he could terminate the

interview; that Carter became agitated approximately fifteen minutes before departing; and, that Carter did not have unobstructed access to the door due to the small size of the interview room. However, under the totality of the circumstances, we find that a reasonable person in Carter's situation would have felt free to leave during the interview. Further, we do not find that there was a formal arrest or "restraint on freedom of movement of the degree associated with a formal arrest." See *Ransom*, supra. Thus, we find that the interview was non-custodial, Miranda warnings were unnecessary, and the trial court did not err in declining to suppress Carter's statements and the fruits thereof.

{¶27} Accordingly, we overrule Carter's assignment of error.

{¶28} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and PRESTON, J., concur.**

**/jlr**