[Cite as *State v. Lerch*, 2013-Ohio-5305.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 26684 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| HEATHER M. LERCH | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 12 03 0632 (D) |

DECISION AND JOURNAL ENTRY

Dated: December 4, 2013

WHITMORE, Judge.

{¶1} Defendant-Appellant, Heather Lerch, appeals from her convictions in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} Shortly before 11:00 p.m. on February 26, 2012, police and paramedics received a call from 552 Saint Leger Street, indicating that a child there was not breathing. Paramedics took the child, Patrick Lerch, to Akron Children's Hospital, where he was pronounced dead. Patrick had bruises, abrasions, burns, and needle puncture marks to his body at the time of his death. An autopsy later revealed that he died from methamphetamine poisoning after having ingested a large amount of the drug. A search of the Saint Leger Street house uncovered numerous components of methamphetamine production.

{¶3} A grand jury indicted Lerch on two counts of illegal manufacturing of methamphetamine, two counts of illegal assembly or possession of chemicals for the

manufacturing of methamphetamine, two counts of aggravated possession of methamphetamine, two counts of illegal use or possession of drug paraphernalia, three counts of child endangering, one count of complicity to commit child endangering, four counts of involuntary manslaughter, one count of felony murder, and one count of complicity to commit felony murder. Lerch sought to suppress the statements she had made to the police solely on the basis that she had not been Mirandized. The court held a hearing on Lerch's motion to suppress and ultimately denied it. The matter was then set for trial.

{¶4} The State dismissed six counts before trial, and the court acquitted Lerch of two counts at the close of the State's case. The remaining ten counts were given to the jury, and the jury found Lerch not guilty of four counts. The jury found Lerch guilty of the six following counts: (1) child endangering, in violation of R.C. 2919.22(B)(1); (2) felony murder, in violation of R.C. 2903.02(B), with child endangering (R.C. 2919.22(B)(1)) as its predicate offense; (3) child endangering, in violation of R.C. 2919.22(A); (4) involuntary manslaughter, in violation of R.C. 2903.04(A), with child endangering (R.C. 2919.22(A)) as its predicate offense; (5) child endangering, in violation of R.C. 2919.22(B)(6); and (6) involuntary manslaughter, in violation of R.C. 2903.04(A), with child endangering (R.C. 2919.22.(B)(6)) as its predicate offense. The trial court sentenced Lerch to a total of 22 years to life in prison.

{¶5} Lerch now appeals from her convictions and raises four assignments of error for our review. For ease of analysis, we rearrange and consolidate several of the assignments of error.

II

Assignment of Error Number Three

LERCH'S CONVICTIONS MUST BE REVERSED BECAUSE THE TRIAL COURT'S DENIAL OF HER MOTION TO SUPPRESS HER UN-MIRANDIZED STATEMENTS TO POLICE DENIED HER A FAIR TRIAL.

**{¶6}** In her third assignment of error, Lerch argues that the court erred by denying her motion to suppress the statements she made to the police during several interviews. Specifically, she argues that her statements were elicited in violation of her *Miranda* rights and given involuntarily. We disagree.

**{¶7}** The Ohio Supreme Court has held that:

[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning*, 1 Ohio St.3d 19 (1982). Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *Accord State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, ¶ 6 (*Burnside* applied). Accordingly, this Court reviews the trial court's factual findings for competent, credible evidence and considers the court's legal conclusions de novo. *State v. Conley*, 9th Dist. Lorain No. 08CA009454, 2009-Ohio-910, ¶ 6, citing *Burnside* at ¶ 8.

**{¶8}** "Pursuant to the Fifth Amendment of the United States Constitution, no person shall be compelled to be a witness against himself." *North Ridgeville v. Hummel*, 9th Dist. Lorain No. 04CA008513, 2005-Ohio-595, ¶ 27. "When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against

compelled self-incrimination." *State v. Wesson*, Slip Opinion No. 2013-Ohio-4575, ¶ 34, citing *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). "Custody" for purposes of entitlement to *Miranda* rights exists only where there is a "'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "Whether a suspect is in custody depends on the facts and circumstances of each case." *State v. Butler*, 9th Dist. Summit No. 23786, 2008-Ohio-781, ¶ 27, quoting *State v. Dunn*, 9th Dist. Lorain No. 04CA008549, 2005-Ohio-1270, ¶ 24. "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." (Internal citations omitted.) *Howes v. Fields*, ___ U.S. ___, 132 S.Ct. 1181, 1189 (2012). The test is "whether, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave." *Butler* at ¶ 27, quoting *Dunn* at ¶ 24.

{¶9} The trial court issued a detailed entry denying Lerch's motion to suppress. Lerch has not specifically challenged any of the trial court's factual findings. Instead, she challenges the legal conclusions the court reached based upon its findings. Having reviewed the record, we accept the trial court's factual findings, as they are based on competent, credible evidence.

{¶10} Detective Gary Shadie, a member of the Akron Police Department's Juvenile Bureau, interviewed Lerch a total of three times, but never Mirandized her. The first interview took place at Akron Children's hospital shortly after Lerch learned that Patrick had died and the following two interviews took place at the police station. The first police station interview occurred before Detective Shadie interviewed Lerch's boyfriend and the second occurred after he interviewed her boyfriend. Detective Shadie conducted all three of Lerch's interviews in his

plain clothes and without his firearm. He also told Lerch before he began interviewing her at the police station that she was free to go and that she did not have to answer any of his questions. Lerch never told Detective Shadie that she did not want to answer his questions and never asked him if she could leave.

{¶11} Detective Shadie's purpose for speaking with Lerch was to gain basic information about Patrick, including any medical issues he might have had, and to figure out where Patrick was and who he was with at the time of his injuries. Although the trial court did not indicate that it relied upon the following facts in reaching its determination, it is noteworthy that Detective Shadie's first interview with Lerch lasted approximately 30 minutes and took place in the presence of a clergy member from the hospital and an investigator from the Summit County Medical Examiner's Office. After the first interview concluded, Lerch walked outside to smoke with her boyfriend, Randy Legg. Detective Shadie then approached the two and asked if they would be willing to come to the police station for further questioning. Both Lurch and Randy agreed.

{¶12} Lerch accepted a ride to the police station from Officer Sean Taylor because she did not have a car with her at the hospital. After Lerch arrived at the police station, she was taken to one of the interview rooms in the Juvenile Bureau. Detective Shadie then momentarily left the room. Because the interview room was equipped with video recording equipment, Lerch was recorded in Detective Shadie's absence as well as after he returned. The video recording depicts Lerch speaking to someone off screen in Detective Shadie's absence and asking if she can leave the room due to her claustrophobia. The individual replies "no." The person who told Lerch "no" was never identified, but the parties stipulated that it had to be a member of law enforcement. Even so, Lerch never asked Detective Shadie if she could leave. When Detective

Shadie came back to the interview room, Lerch again indicated that she was claustrophobic, and Detective Shadie agreed to leave the interview room door open.

{¶13} The table in the interview room had handcuffs welded to it, but Lerch was never placed in the handcuffs or otherwise restrained during Detective Shadie's interviews. Lerch was able to keep her cell phone with her at all times and even received a text message at some point during Detective Shadie's interview. She was given a restroom break when she asked, as well as a cigarette break for which she left the building. Detective Shadie left Lerch at several points, including when she took her breaks, because he went to interview Randy.

{¶14} Officer Taylor accompanied Lerch when she took her cigarette break and remained close to her at the police station. He did so "to provide support and as normal police protocol." Having spoken with Detective Shadie, Officer Taylor understood that Lerch was not under arrest and was free to go at any time. Lerch never expressed to either Officer Taylor or Detective Shadie that she wanted to leave or that she no longer wanted to answer questions. Although the court did not say that it relied upon the following facts in its ruling, the record reflects that Detective Shadie's two interviews with Lerch at the station collectively lasted no longer than one hour in length, including the time that Lerch took a restroom break.

{¶15} Having reviewed the record, we agree with the trial court's conclusion that Lerch was not in custody on any of the three occasions when Detective Shadie interviewed her. Each of the interviews was brief in duration, Lerch was never physically restrained, and Detective Shadie specifically told Lerch that she was not under arrest and that she could leave at any time if she did not wish to speak with him. *See Howes*, ___ U.S. ___, 132 S.Ct. at 1189. *See also State v. Tellington*, 9th Dist. Summit No. 22187, 2005-Ohio-470, ¶ 12. The interview at the hospital took place in the presence of other people, including a clergy member. At the

conclusion of that interview, Lerch left the room of her own accord and later, when asked, agreed to come to the police station for further questioning. The fact that Lerch was taken to the police station for questioning by way of a marked cruiser is not, in and of itself, evidence that she was in custody. *See State v. McCrary*, 2d Dist. Montgomery No. 18885, 2002 WL 125760 (Feb. 1, 2002). The evidence was such that she had ridden to the hospital in the ambulance and needed transportation.

**{¶16}** Lerch was never restrained at the police station. Although the interview room was equipped with handcuffs, there is no evidence that Detective Shadie ever threatened to use them on her. *See Howes*, ___ U.S. ___, 132 S.Ct. at 1189. Detective Shadie was dressed in plain clothes the entire time he was with Lerch and was not wearing a firearm. Lerch kept her personal items with her, including her cell phone, at all times and even received a text message at one point. *See State v. Carter*, 3d Dist. Allen No. 1-10-01, 2010-Ohio-5189, ¶ 19-26. Additionally, she was given various breaks, including a restroom break and a cigarette break. Although Officer Taylor accompanied Lerch on her cigarette break and remained close to her while she was at the police station, there was evidence that he did so because she was very upset and there was a concern over her smoking outside by herself at that time of night.

**{¶17}** There is no evidence that Lerch ever asked Detective Shadie to stop questioning her. While Lerch asked an unidentified member of law enforcement at the police station if she could leave the interview room, the reason she gave for her request was that she was claustrophobic. Lerch addressed her claustrophobia again with Detective Shadie when he entered the interview room, and he responded by agreeing to leave the interview room door open. There is no evidence that Lerch was dissatisfied with his response or ever asked to leave the police station itself. *See Carter* at ¶ 25. Under the totality of the circumstances, we must

conclude that a reasonable person in Lerch's position would have felt free to leave. *Butler*, 2008-Ohio-781, at ¶ 27, quoting *Dunn*, 2005-Ohio-1270, at ¶ 24. Thus, no *Miranda* warning was required.

{¶18} Lerch also argues that her statements to the police were involuntary. "Even when Miranda warnings are not required, the Due Process Clause of the Fourteenth Amendment requires the exclusion of [inculpatory statements] that are involuntarily given by an accused." *State v. Antoline*, 9th Dist. Lorain No. 02CA008100, 2003-Ohio-1130, ¶ 21. *Accord State v. Chase*, 55 Ohio St.2d 237, 246 (1978) ("[T]he question of whether the accused's statements were in fact voluntary is separate from the question of compliance with Miranda."). An inculpatory statement cannot be said to be voluntary if, under the circumstances surrounding its procurement, the defendant's "will was overborne." *Id.* at 247, quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).

> In determining whether [an inculpatory statement] was voluntary, the court considers the totality of the circumstances, including the defendant's 'age, mentality, and prior criminal experience * * *[;] the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*State v. Grunder*, 9th Dist. Medina No. 04CA0071-M, 2005-Ohio-2145, ¶ 9, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911 (1978). "Absent evidence that a defendant's will was overborne and that his capacity for self-determination was critically impaired because of coercive police conduct, the decision of a suspect to waive his right to Fifth Amendment privilege against self-incrimination is considered voluntary." *State v. Wooden*, 9th Dist. Summit No. 23992, 2008-Ohio-3629, ¶ 7.

{¶19} As the trial court noted, Lerch did not have any prior contact with the criminal justice system, and Detective Shadie was well-trained in interview techniques aimed at earning

the trust of the suspect. There also was evidence that Lerch was only about 20 years old and was very upset when Detective Shadie spoke with her. Nevertheless, the interviews Detective Shadie conducted with Lerch were short in duration and geared toward information-gathering. Lerch was only interviewed at the police station for a total of an hour, but was given both a bathroom break and a cigarette break. Detective Shadie also left the interview room door open at Lerch's request to make her more comfortable. Further, he specifically told Lerch that she was not under arrest and did not have to answer any of his questions. There was no evidence that Lerch was deprived of anything or mistreated in any way. Moreover, there was no evidence that she was threatened or induced. Having reviewed the record, we cannot conclude that the trial court erred by rejecting Lerch's argument that her statements were obtained by coercion.

{¶20} The trial court did not err by denying Lerch's motion to suppress. Therefore, Lerch's third assignment of error is overruled.

Assignment of Error Number One

LERCH'S CONVICTIONS MUST BE REVERSED BECAUSE THE KEY EVIDENCE THAT SUPPORTED THOSE CONVICTIONS WAS GATHERED BY POLICE WITHOUT A SEARCH WARRANT IN VIOLATION OF LERCH'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

Assignment of Error Number Two

LERCH'S CONVICTIONS MUST BE REVERSED BECAUSE SHE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HER BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶21} In her first assignment of error, Lerch argues that her convictions must be reversed because they are premised on evidence the police obtained during a warrantless search, in violation of her Fourth Amendment rights. Lerch acknowledges that her trial counsel never raised the foregoing argument in a motion to suppress, but asks this Court to review her

argument for plain error. In her second assignment of error, Lerch argues that her trial counsel was ineffective because he did not seek to suppress the warrantless search.

**{¶22}** If a defendant fails to seek the suppression of certain evidence, she forfeits any objection to the admissibility of that evidence and limits herself to a claim of plain error on appeal. *State v. Taylor*, 9th Dist. Summit No. 22882, 2006-Ohio-2041, ¶ 17. *Accord State v. Strehl*, 9th Dist. Medina No. 10CA0063-M, 2012-Ohio-119, ¶ 16.

> To correct a plain error, all of the following elements must apply: "First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶23}** Officers Sean Taylor and Joseph Horak were the first officers to arrive at the Saint Leger Street house after the 911 call. Paramedics from the Akron Fire Department were already on scene when they arrived. Officer Horak testified that Officer Taylor left the scene in the ambulance, but that he remained behind. His reasons for doing so were "to make sure that * * *there [were] no other victims," to make sure no possible witnesses or suspects left, and to "hold the scene" until a higher-ranking officer arrived. Officer Horak spoke to Randy Legg and his mother, Tonia, outside and asked them for their social security numbers as well as Patrick's personal information. Because that information was inside the house, Officer Horak, Randy, and Tonia all went inside.

{¶24} Once he was inside, Officer Horak asked Randy and Tonia if anyone else was in the house. Randy and Tonia indicated that Randy's brother, Ronnie, was sleeping upstairs. Randy took Officer Horak upstairs to find his brother and, at some point while they were upstairs, showed Officer Horak the bedroom and crib in which Patrick allegedly had slept. Officer Horak testified that the house was very dark inside and that he had to use his flashlight to see. Officer Horak found Ronnie lying on the floor in his room, fully clothed, and had Ronnie come down to the living room. The room in which Officer Horak found Ronnie also had a crib inside of it.

{¶25} After Ronnie came downstairs and Officer Horak had another look at the upstairs bedroom where Patrick had supposedly been sleeping, he was informed that there was another individual in the house. Specifically, he was told that Tonia's boyfriend, Roger Jarvis, was sleeping in the back bedroom on the first floor. Officer Horak then went to the back bedroom and asked Tonia's boyfriend to come to the living room with everyone else.

{¶26} At some unspecified point while Officer Horak was inside the house, other officers were arriving. Officer Horak testified that he spoke with Sergeant Kelly after Randy, Ronnie, Tonia, and Jarvis were seated in the living room. Officer Horak told Sergeant Kelly that he was concerned because, since entering the house, he had discovered at least two additional people were in it and he had not had the opportunity to check the house "to see if anybody [was] hiding" or if "anybody else [was] injured." Sergeant Kelly then told Officer Horak to "check the whole house."

{¶27} Officer Horak rechecked the rooms upstairs, crawled into the attic to make sure no one was hiding, and then headed down to the basement. He testified that the basement was dark because there were not any lights and that he had to use his flashlight to see. Officer Horak

stated that he was looking through the basement "to make sure that nobody [was] hiding and there [were not] any other victims." He stated that he was looking for people "big or small, because of the nature of the call." He specified: "It was a baby call, so I didn't know – I had never met these people. I [did not] know how many kids they have, I didn't know [if] they had kids. * * * I [did not] know who lived there or who visited."

{¶28} While looking through the basement, Officer Horak observed a large wooden trunk and opened it. When he opened the trunk, he observed bottles with tubing and became concerned that the items were related to methamphetamine production. Officer Horak finished checking the basement for people and returned upstairs. He informed his sergeants what he had found and awaited further instructions. At some point before he left the house, Sergeant Kelly asked Officer Horak to have Tonia sign a consent to search form for a thorough search of the house. Officer Horak explained that his preliminary search was limited to looking for people and was not a detailed search. He specified that he did not open drawers or look through the cupboards in the house when he walked through it. Officer Horak estimated that he had been inside the house for 30 to 45 minutes when he found the bottles and tubing inside the trunk in the basement.

{¶29} Apart from the fact that he had been dispatched to the house regarding a baby who was not breathing, Officer Horak testified that several observations he made while inside the house caused him concern. He testified that the house was very dark and that "there [were] probably only two working light bulbs in [it]." He described the condition of the house as "deplorable" and stated that, when he looked inside the crib where Patrick had supposedly been sleeping, he only observed a plate of chicken wings sitting on the mattress. Further, Officer Horak found it strange that the members of the household did not immediately disclose how

many people were in the house. He also found it strange that there were at least two people in the house who had retreated to various bedrooms to sleep, despite having knowledge that the paramedics and police were on their way.

{¶30} We conclude that the trial court did not commit plain error by admitting the evidence the police found at the Saint Leger Street house. The evidence was such that Officer Horak conducted a protective sweep of the house and opened the large wooden trunk he found pursuant to the emergency aid exception. *See State v. Martin*, 9th Dist. Summit No. 25452, 2011-Ohio-2379, ¶ 11-22 (search of padlocked room in basement upheld where officer was conducting a protective sweep and also had an "interest in checking the enclosure for victims"). *See also State v. Baker*, 9th Dist. Summit No. 23713, 2009-Ohio-2340, ¶ 6, quoting *State v. Gooden*, 9th Dist. Summit No. 23764, 2008-Ohio-178, ¶ 6 (emergency aid exception defined). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Further, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." (Internal Quotations omitted.) *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, ¶ 19. So long as the circumstances, when viewed objectively, can be said to justify the officer's actions, the search is reasonable under the Fourth Amendment. *Id.*

{¶31} Officer Horak responded to an emergency at the house involving a 17 month old baby. Although the paramedics removed a victim from the house prior to his arrival, Officer Horak testified that he did not know if there were additional victims in the house. There were two cribs upstairs and, before his search, Officer Horak became aware that Randy and Tonia had failed to tell him how many individuals were present in the house. He also became aware that

14

Ronnie and Jarvis had gone to their respective bedrooms to sleep after having learned that Patrick was not breathing and the paramedics were on their way. Moreover, Officer Horak observed deplorable conditions in the home, including a plate of food in the baby's crib, garbage strewn throughout the home, and exceedingly poor lighting conditions. The trunk that Officer Horak found in the basement was large and could have concealed a child inside it, unlike the drawers and cabinets that Officer Horak left closed while conducting his search. Given the particular facts and circumstances that exist in this case, we cannot conclude that Lerch has demonstrated plain error with regard to Officer Horak's search of the home and his opening of the trunk he found in the basement. Moreover, because the bottles and tubing in the trunk gave Officer Horak probable cause to suspect illegal drug activity was occurring in the house, Lerch has not shown that a valid basis existed to challenge the subsequent, in depth search of the house that took place. Lerch's first assignment of error is overruled.

{¶32} Lerch also argues that her trial counsel was ineffective for failing to file a motion to suppress the evidence obtained from the Saint Leger Street house. A successful ineffective assistance claim requires proof that: (1) counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, Lerch must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

{¶33} Lerch cannot demonstrate prejudice as a result of her counsel's failure to file a motion to suppress the evidence found at the Saint Leger Street house. As discussed below, the

evidence at trial was that Patrick died of methamphetamine poisoning after having ingested a large amount of the drug. The cause of Patrick's death, therefore, was evidence that Patrick was exposed to methamphetamine. That evidence stands separate and apart from the evidence that the police discovered at the house. Lerch has not shown that, had her counsel sought to suppress the evidence taken from the house, the result of her trial would have been different. *Id.* Consequently, her ineffective assistance of counsel argument lacks merit and her second assignment of error is overruled.

Assignment of Error Number Four

> LERCH'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF
> THE EVIDENCE, AND MUST BE REVERSED.

{¶34} In her fourth assignment of error, Lerch argues that her convictions are against the manifest weight of the evidence. We disagree.

{¶35} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against

the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶36} Lerch was convicted of three different types of child endangering with each child endangering conviction serving as the predicate offense for either a felony murder or involuntary manslaughter conviction. For sake of clarity, we set forth the elements of each child endangering count in conjunction with that count's attendant murder or manslaughter count.

{¶37} R.C. 2919.22(B)(1) provides that no person shall abuse any child under 18 years of age. If serious physical harm to the child results from the abuse, then the violation of R.C. 2919.22(B)(1) is a felony of the second degree. R.C. 2919.22(E)(2)(d). R.C. 2903.02(B), Ohio's felony murder statute, prohibits any person from causing the death of another "as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." Child endangering, pursuant to R.C. 2919.22(B)(1), is an offense of violence. R.C. 2901.01(A)(9)(a). Lerch was charged with child endangering, in violation of R.C. 2919.22(B)(1), and felony murder as a result of conduct she engaged in from February 12, 2012, through February 26, 2012.

{¶38} R.C. 2919.22(A) provides that "[n]o person, who is the parent * * * of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." If serious physical harm to the child results, then a violation of R.C. 2919.22(A) is a felony of the third degree. R.C. 2919.22(E)(2)(c). Further, if the commission of the felony child endangering causes the death of the child involved, the offender is guilty of involuntary manslaughter. R.C. 2903.04(A), (C). Lerch was charged with child endangering, in violation of R.C. 2919.22(A), and involuntary

manslaughter as a result of conduct she engaged in from September 10, 2010, through February 26, 2012.

{¶39} R.C. 2919.22(B)(6) forbids any person from allowing a child under 18 years of age "to be on the same parcel of real property and within one hundred feet of * * * any act in violation of section 2925.04 or 2925.041 of the Revised Code when the person knows that the act is occurring." R.C. 2925.04 and 2925.041 govern the illegal manufacturing of controlled substances and the illegal assembly of chemicals used to manufacture those substances. If serious physical harm to the child results from a violation of R.C. 2919.22(B)(6), then the violation is a felony of the second degree. R.C. 2919.22(E)(3). If the commission of the felony child endangering causes the death of the child involved, the offender is guilty of involuntary manslaughter. R.C. 2903.04(A), (C). Lerch was charged with child endangering, in violation of R.C. 2919.22(B)(6), and involuntary manslaughter as a result of conduct she engaged in from February 12, 2012, through February 26, 2012.

{¶40} Detectives Michael Fox and David Hayes responded to the Saint Leger Street house as part of the crime scene unit and documented the scene. Detective Fox documented old food on plates throughout the house, dirty dishes piled in the kitchen, and numerous items and trash strewn throughout the house. He also testified that it was apparent that drug activity was occurring at the house. Detective Fox found used coffee filters that later tested positive for methamphetamine taped next to the furnace in the basement to dry and also found bottles that had been used to cook methamphetamine strewn in the backyard. Detective Hayes testified that there was hardly any lighting in the house and the basement was pitch black. He further testified that the windows to the house were covered and there "was just a mix of kids' toys and garbage everywhere."

**{¶41}** Officer David Crockett, a member of the Clandestine Laboratory Enforcement Team, responded to the Saint Leger Street house as well. Officer Crockett testified that manufacturing methamphetamine is highly dangerous and that the components used to make it are both poisonous and flammable. He testified that most of the homes where methamphetamine is being manufactured have covered up windows to both prevent people from seeing in and to reduce the smell associated with the manufacturing. Additionally, Officer Crockett testified that people who use methamphetamine display very obvious symptoms of use, including that they "appear jittery or antsy [and] can't stop moving around."

**{¶42}** Officer Crockett stated that he found numerous components of methamphetamine in the Saint Leger Street house, including items in the kitchen, upstairs bedroom closet, upstairs bathroom, basement, backyard, and garage. In the basement alone, Officer Crockett found: (1) the trunk full of bottles and tubing; (2) twisted up coffee filters, which he explained are used in the manufacturing process; (3) wet coffee filters that had been hung to dry; (4) lighters and light bulbs, which he explained can be used to smoke methamphetamine; (5) a razor blade with white residue on it; and (6) a straw with residue on it. The twisted up coffee filters, light bulbs, razor blade, and straw were all found sitting on the coffee room table in the basement.

**{¶43}** During her first and second interviews with Detective Shadie, Lerch told Detective Shadie that Patrick had been with her all day on the day he died and had simply stopped breathing after she put him to bed. Lerch elaborated that she had cooked for Patrick all day, bathed him, repeatedly changed his diaper, and took him to bed around 10:30 p.m. Lerch further elaborated that Patrick had difficulty falling asleep, so she held him, kissed him, allowed him to hold onto her finger, and rocked him on her chest until he fell asleep. Lerch stated that she then placed Patrick in the crib, left the room, and came back to check on him fifteen to

twenty minutes later. Lerch told Detective Shadie that she placed a hand on Patrick's chest to see if he was breathing as well as a finger under his nose to test for breath. Lerch indicated that Patrick was still warm, but not breathing. She told Detective Shadie that she then carried Patrick down to the living room and performed CPR until the paramedics arrived. Lerch denied that anyone in the house used illegal drugs. She further denied that Patrick had ever been in the basement. When Detective Shadie asked Lerch if she knew what was in the basement, Lerch replied "spiders."

{¶44} Dr. Nicholas Reinhart testified that he treated Patrick at Akron Children's Hospital when he arrived by ambulance. Dr. Reinhart indicated that resuscitative efforts ended quickly because it became clear that Patrick would not respond to them. Dr. Reinhart specified that Patrick already showed signs of rigor mortis and livor mortis when he was brought to the hospital.

{¶45} Dr. Lisa Kohler, the chief medical examiner for Summit County, testified regarding Patrick's autopsy. Dr. Kohler testified that Patrick had numerous bruises, contusions, and abrasions to his body, including his face, the back of his head, his spine, and his arms and legs. Dr. Kohler also observed burn injures to Patrick's ear, scalp, and eyebrow areas, and needle puncture injuries to his feet. Dr. Kohler testified that Patrick's injuries were not consistent with therapeutic treatment and that they appeared to have been inflicted recently, although how recently she could not say. Dr. Kohler gave Patrick a failure to thrive designation as well, as his growth percentiles had dropped below the acceptable amount. Dr. Kohler testified that Patrick ultimately died as a result of methamphetamine toxicity after having ingested a large amount of the drug. She further opined that, based on the results of the examination, Patrick had been dead several hours before arriving at Akron Children's Hospital.

{¶46} Kimberly Clark, whose husband was Lerch's relative, testified that she and her husband agreed to take Lerch and Patrick into their home several months before Patrick's death because they learned Lerch and Patrick had been living at a homeless shelter. Clark testified that, during Lerch's stay at her home, she frequently had to remind Lerch to feed Patrick and change his diaper. Moreover, although Clark told Lerch to keep Patrick away from one of the family dogs, she testified that Lerch did not do so and the dog later bit Patrick. Clark stated that Patrick saw the doctor several times while Lerch lived at her home, but that Clark always made the appointments on Lerch's behalf and drove her and Patrick to the doctor's office. Clark indicated that the situation worsened when Lerch met Randy Legg in January 2012.

{¶47} Towards the end of January 2012, Lerch took Patrick to Randy's house for the weekend. Clark testified that when Lerch brought Patrick back to her home his voice was hoarse and he had a black eye. Lerch told Clark that Patrick's voice was hoarse because he had been playing a lot and his eye was bruised because he had fallen on a toy. Clark recommended that Lerch take Patrick to the doctor, however, when he also started having white diarrhea. Clark and Lerch took Patrick to the doctor on February 1, 2012. The hospital records from the February 1st visit indicate that Patrick was suffering from vomiting and white diarrhea, but that his development was appropriate for a boy his age and that he was otherwise healthy. The records from the visit also indicate, however, that Lerch was to bring Patrick for a follow-up visit in a week. There was no evidence that Lerch ever brought Patrick for a follow-up visit.

{¶48} On February 11, 2012, Lerch told Clark that she intended to have Patrick spend the night with her at Randy's house again. Clark indicated that Lerch would not be welcome back at her home if she chose to take Patrick to Randy's house again. Lerch nonetheless decided to take Patrick there. As a result, Clark had Lerch remove her personal items from her home and

ended their shared living arrangement. Clark also contacted Children's Services to report what she believed was an unsafe living environment for Patrick.

{¶49} Heather Murphy, a social worker for Summit County Children's Services, conducted a home visit at the Saint Leger Street house on February 16, 2012, after Clark reported a possible safety issue there. Murphy testified that she walked through the house while she was there, but not the basement, as Lerch told her that Patrick never went in the basement. Murphy indicated that the kitchen was clean when she visited and that she did not observe anything during her visit that gave her reason to think Patrick should be removed from the home. Murphy confirmed, however, that she had scheduled her home visit with Lerch beforehand such that Lerch was aware she was coming. She also confirmed that, when she visited the house, it did not look the way that it looked in the pictures that the police took when they searched it.

{¶50} Allen Kostra testified that he was present at the Saint Leger Street house on the weekend Patrick died. Kostra admitted that he was an addict and had come to the house several times during February 2012 to smoke methamphetamine with Ronnie Legg. According to Kostra, Lerch was aware that he and Ronnie smoked methamphetamine in the basement and smoked marijuana all over the house, as she had observed them smoking both. Kostra also confirmed that Patrick was at the house when he and Ronnie were using the drugs.

{¶51} Kostra testified that he and Ronnie smoked methamphetamine the entire weekend on the weekend that Patrick died and that, much of the time, Patrick was in the basement with them. According to Kostra, Lerch left Patrick in Ronnie's care the day before he died so that she could go to the mall. On the day Patrick died, Patrick was downstairs almost the entire day. Kostra stated that Lerch came down once or twice to check on Patrick, but never tried to remove him from the basement. While Patrick was in the basement, Kostra observed Ronnie hit him and

throw him. He also observed Ronnie shove a coffee filter in Patrick's mouth at one point because he was crying. Kostra testified that Patrick was acting strangely that night and seemed to be having trouble breathing, so he told Lerch. Lerch, however, did nothing.

{¶52} Even later that evening, Kostra testified that Lerch came downstairs to borrow his food stamp card so that she could go to Circle K. Kostra indicated that Patrick was still in the basement at that point because Ronnie had put him on a mattress in the corner. Detective Shadie testified that, during the course of the investigation, he obtained the surveillance footage from Circle K. Lerch appears on the surveillance footage at 10:16 p.m. Detective Shadie confirmed that the 911 call regarding Patrick came in at 10:47 p.m., and the hospital records indicate that Patrick arrived at Akron Children's Hospital for treatment at 11:17 p.m. As previously set forth, the evidence was that Patrick had been dead for several hours before he was brought to the hospital.

{¶53} In her third interview with Detective Shadie, Lerch admitted that Patrick had been in the basement all day. Lerch claimed that she lied about Patrick's whereabouts because, before the paramedics arrived, Ronnie told her that she would "go down with him" if she told the truth. Lerch also claimed that she tried to see Patrick several times on the day that he died, but that Ronnie would prevent her from coming down into the basement. According to Lerch, she did not realize that Ronnie and Kostra were smoking methamphetamine in the basement. Lerch stated that she did not know what was happening in the basement because it was her preference not to be down there. Lerch also stated that, while she knew methamphetamine had been made at the Saint Leger Street house, she thought the last time it had been cooked was about a month before Patrick died.

{¶54} Having reviewed the record, we must conclude that Lerch's convictions are not against the manifest weight of the evidence. There was evidence that Patrick incurred injuries several weeks before his death after Lerch took him to the Saint Leger Street house, but that she continued to take him there. Various components of methamphetamine production were strewn throughout the house, which was both filthy and dark, and there was testimony that Kostra and Ronnie were actively smoking methamphetamine on the weekend Patrick died. Detective Crockett testified that methamphetamine users display obvious symptoms, and Kostra testified that Lerch was aware he and Ronnie were high while Patrick was with them. Lerch, however, initially denied having any knowledge that drugs were being used in the house, and instead, gave Detective Shadie an elaborate version of the events prior to Patrick's death. That version of events included Lerch carefully taking care of Patrick, kissing him and letting him hold onto her finger, and rocking him to sleep before she placed him safely in his crib for the night. Even when Lerch later admitted that she had lied, she claimed that she had done so because Ronnie prevented her from reaching her son.

{¶55} Patrick suffered numerous injuries before his death, including bruises, abrasions, burns, and needle punctures. He finally died of a methamphetamine overdose in the pitch black basement that Lerch herself did not want to spend time in. The evidence showed that he had been dead for several hours before Lerch decided to check on him. Given all the evidence before us, we conclude that this is not the exceptional case where the jury clearly lost its way by convicting Lerch of three counts of child endangering, two counts of involuntary manslaughter, and one count of felony murder. Lerch's fourth assignment of error is overruled.

III

{¶56} Lerch's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.