[Cite as *State v. Brantley*, 2016-Ohio-4680.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27466 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DERRICK BRANTLEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 13 05 1404 (B) |

DECISION AND JOURNAL ENTRY

Dated: June 30, 2016

MOORE, Judge.

{¶1} Defendant-Appellant Derrick Brantley appeals from his convictions in the Summit County Court of Common Pleas. We affirm.

I.

{¶2} During the early morning hours of April 18, 2013, Ronald Roberts (aka "Dutch"), who was 24 years old at time, his girlfriend, Kiana Welch, who was 19 years old, Kem Delaney, who was 23 years old, and Maria Nash, who was 19 years old, were shot to death in the basement of the apartment at 42 Kimlyn Circle in Akron, where Mr. Roberts and Ms. Welch resided. There were no eyewitnesses to the murders but cell phone records and witness interviews led police to suspect that Mr. Brantley (aka "Buck") and Mr. Brantley's friend, Deshanon Haywood (aka "Dougie" or "Doug") were involved.

{¶3} Ultimately, Mr. Brantley and Mr. Haywood were indicted on a multi-count indictment in connection with the murders. Mr. Brantley was charged with 13 counts of

aggravated murder, each including 4 capital specifications and a firearm specification, 4 counts of aggravated robbery with attendant firearm specifications, 4 counts of kidnapping with attendant firearm specifications, 1 count of aggravated burglary with an attendant firearm specification, and 1 count of having weapons while under disability. The matter proceeded to a jury trial on all counts, except for the weapons under disability charge, which was tried to the court. The jury found Mr. Brantley guilty of all counts and attendant specifications, and the trial court found Mr. Brantley guilty of having weapons while under disability. Prior to the commencement of the mitigation phase, the State elected to merge the aggravated burglary specifications with the aggravated robbery specifications and elected to merge the 3 other aggravated murder counts involving Mr. Roberts into count 1, the 3 other aggravated murder counts involving Mr. Delaney into count 2, the 3 other aggravated murder counts involving Ms. Nash into count 7, and the three other murder counts involving Ms. Welch into count 8. The jury found that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt and returned verdicts of life imprisonment without the possibility of parole for counts 1, 2, 7, and 8.

{¶4} At the time of sentencing, the State elected to have the remaining counts and associated specifications merge into counts 1, 2, 7, and 8. The trial court sentenced Mr. Brantley to life imprisonment without the possibility of parole on each of the 4 counts and ordered the sentences to be served consecutively. Additionally, the trial court sentenced Mr. Brantley to 3 years on each of the 4 firearm specifications and ordered those terms to be served prior to, and consecutively to each other and the life terms.

{¶5} Mr. Brantley has appealed, raising six assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

[MR.] BRANTLEY'S RIGHT TO A FAIR AND IMPARTIAL TRIAL WAS VIOLATED WHEN THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT BY FAILING TO DISCLOSE THAT MATERIAL WITNESSES HAD MADE PLEA DEALS WITH THE STATE IN EXCHANGE FOR THEIR TESTIMONY[.]

{¶6} Mr. Brantley asserts in his first assignment of error that the State engaged in prosecutorial misconduct which denied him a fair trial by failing to disclose that certain witnesses had entered into plea agreements in exchange for their testimony. Because there is no evidence in the record which would support Mr. Brantley's argument, we overrule it on that basis.

{¶7} Mr. Brantley's argument is premised on events that took place after his trial and are not a part of the record in this case. He argues that his co-defendant, Mr. Haywood, who was tried after Mr. Brantley, was granted a new trial after his defense counsel discovered that the prosecutors failed to disclose that two witnesses in Mr. Haywood's trial were given plea deals in exchange for their testimony and that their testimony did not reflect that fact. However, none of that evidence is part of this record. "[A] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." (Internal quotations and citations omitted.) *State v. Weems,* 9th Dist. Summit No. 26532, 2013-Ohio-2673, ¶ 14. Because Mr. Brantley's argument relies completely on evidence outside of the record, we are required to overrule his assignment of error on that basis. Mr. Brantley's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE EVIDENCE IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A CONVICTION OF AGGRAVATED MURDER AND, AS A RESULT, [MR.] BRANTLEY'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONS[T]ITUTION WERE VIOLATED[.]

{¶8} Mr. Brantley argues in his second assignment of error that there was insufficient evidence to support the jury's verdicts finding him guilty of aggravated murder. While not separately assigned as error, in the body of his argument, he additionally states that the evidence did not support a finding of guilt with respect to the capital specifications.

{¶9} The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶10} To the extent that Mr. Brantley maintains that there was insufficient evidence to support the verdicts because some of the State's witnesses' testimony was not credible, we disagree with his argument; such an argument challenges the weight of the evidence, not the sufficiency of the evidence. The remainder of Mr. Brantley's argument appears to focus on whether there was sufficient evidence that Mr. Brantley committed the murders. It does not appear that Mr. Brantley otherwise challenges any specific element of the crimes.

{¶11} Mr. Brantley was found guilty of 13 counts of aggravated murder; 4 counts involved R.C. 2903.01(A), and 9 counts involved R.C. 2903.01(B) (aggravated felony murder).

With respect to the R.C. 2903.01(B) charges, 4 of the counts alleged the murders took place during an aggravated robbery, 4 of the counts alleged that the murders took place during a kidnapping, and 1 of the counts (naming all four victims) alleged the murders took place during an aggravated burglary. Each of the 13 counts contained the same 4 capital specifications: 1 alleged a violation of R.C. 2929.04(A)(5) (course of conduct involving purposeful killing of two or more victims) and 3 alleged violations of R.C. 2929.04(A)(7) (committed in the course of aggravated robbery, kidnapping, or aggravated burglary and offender was principal offender or offender committed the aggravated murder with prior calculation and design). In addition, we note that the jury was instructed on complicity.

{¶12} R.C. 2903.01, the statute proscribing aggravated murder, provides in pertinent part that:

> (A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.

> (B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, * * * aggravated robbery, * * * [or] aggravated burglary * * *.

"A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." Former R.C. 2901.22(A). "No bright-line test exists that emphatically distinguishes between the presence or absence of prior calculation and design. Instead, each case turns on the particular facts and evidence presented at trial." (Internal quotations and citations omitted.) *State v. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 154. "However, where the evidence presented at trial reveals the presence of sufficient time and opportunity for the planning of an

act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." (Internal quotations and citations omitted.) *Id.* "'[P]rincipal offender' means the 'actual' killer and not the 'sole' offender. As there can be more than one actual killer, there can thus be more than one principal offender." (Citation omitted.) *State v. Stojetz,* 84 Ohio St.3d 452, 458-459 (1999).

{¶13} R.C. 2911.01, the statute prohibiting aggravated robbery, provides in pertinent part:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶14} R.C. 2905.01, the statute prohibiting kidnapping, provides in relevant part:

(A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another[.]

{¶15} Finally, the statute prohibiting aggravated burglary, R.C. 2911.11 states in pertinent part:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is

present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶16} After reviewing the record in a light most favorable to the State, we conclude sufficient evidence was presented which would allow a reasonable jury to find Mr. Brantley guilty of the challenged offenses.

{¶17} Isaac Love, a friend of Mr. Roberts who was in business with Mr. Roberts selling heroin, testified that, during the evening of April 17, 2013, several people came over to Mr. Roberts' apartment including Mr. Love, Anthony Townsend, Mr. Delaney, and Kevin Cook. Mr. Cook testified that he was only at the apartment for a few minutes to sell marijuana to Mr. Love. Mr. Love indicated that he left the apartment around 8:30 pm, after he received a 100 gram delivery of heroin, for which he paid $10,000. Before leaving, Mr. Love left 30 grams of the heroin at the apartment for Mr. Roberts. There was testimony that .1 grams of heroin could sell for $20 on the street.

{¶18} Mr. Townsend, who at the time of trial was serving a prison sentence for trafficking in heroin, testified that and he and Mr. Roberts were friends from the neighborhood, and that he knew Ms. Welch through Mr. Roberts. Mr. Townsend indicated that he frequented nightclubs and had seen Mr. Haywood and Mr. Brantley at Club Escape. On one occasion, while Mr. Townsend was with Mr. Roberts and Mr. Delaney, Mr. Brantley and Mr. Haywood came over and talked to Mr. Roberts and Mr. Delaney but Mr. Townsend did not hear what they talked about.

{¶19} Mr. Townsend averred that, on the evening of April 17, 2013, he went to Mr. Roberts' apartment, hung out in the kitchen, and left around 9:00 pm. Several other people were also there. He ultimately went to Dreamer's nightclub where Ms. Welch and Ms. Nash were working as exotic dancers. At Dreamer's, he ran into his long-time friend, Keenan Williams, whom he had not seen in a long time. The two began talking with Ms. Welch and Ms. Nash. Around midnight, the four left and went to the Denny's on Arlington. Mr. Williams took a taxi and Ms. Welch and Ms. Nash rode with Mr. Townsend in his car.

{¶20} Upon leaving Denny's, the four decided to go to Ms. Nash's apartment. There, Ms. Welch and Mr. Townsend engaged in sexual intercourse, as did Mr. Williams and Ms. Nash. According to Mr. Townsend, Mr. Williams and Ms. Nash fell asleep. Later, Mr. Townsend woke them up as he needed to get home to his girlfriend, with whom he was living at the time. The four waited for Mr. Williams' taxi to arrive and then Mr. Townsend proceeded to drive Ms. Welch and Ms. Nash to Kimlyn Circle. According to Mr. Townsend, he dropped Ms. Nash and Ms. Welch off at Kimlyn Circle around 3:00 am on April 18, 2013.

{¶21} After Mr. Townsend returned home, he received a phone call from Ms. Welch. Ms. Welch indicated that Mr. Roberts would not let her in the house and asked if Mr. Townsend would come get her. Ms. Welch indicated that she saw "him" through a window in the house running around, but he would not open the door. Mr. Townsend heard Ms. Welch identify "him" as either "Doug" (presumably Mr. Haywood) or "Dutch" (presumably Mr. Roberts). At the time Mr. Townsend thought she had said "Doug" but he could not be sure. Mr. Townsend agreed to go pick her up, but in reality he knew he could not leave the house because his girlfriend was already angry with him for coming home so late. Mr. Townsend called Ms. Welch back and asked if things were alright, and Ms. Welch indicated that she was "cool." Mr. Townsend

assumed that meant she had successfully got into the apartment. Much of Mr. Townsend's testimony was corroborated by Mr. Williams' trial testimony.

{¶22} Meanwhile, around 1:10 am on April 18, 2013, cell phone records revealed that Mr. Roberts' phone received a phone call from a phone registered to Mr. Haywood. Shortly thereafter, the records indicate that a call was placed from the phone registered to Mr. Haywood to a phone associated with Deonte Woods[1], Mr. Haywood's and Mr. Brantley's close friend. Mr. Woods testified that he, Mr. Brantley, and Mr. Haywood were all involved in the sale and use of heroin. Mr. Woods stated that Mr. Haywood had called and asked him to follow him somewhere. Mr. Woods did not know where they were going. Shortly thereafter, Mr. Haywood arrived at Mr. Woods' house in a black Kia; Mr. Brantley was in the passenger seat. Mr. Woods followed them in a red Kia. When the vehicles got to the area of Gurley Avenue, the two indicated that Mr. Woods should park his vehicle. Mr. Woods parked facing the area of the Kimlyn Circle apartments. The black Kia drove away and Mr. Woods proceeded to wait for Mr. Haywood and Mr. Brantley to return. Ultimately, Mr. Woods fell asleep. When he awoke, he texted Mr. Haywood or Mr. Brantley, but did not hear back. Mr. Woods testified that he then called both Mr. Haywood and Mr. Brantley and did not get an answer.

{¶23} Phone records revealed that a text message was sent from a 419 area code number associated with Mr. Brantley to Mr. Haywood's phone at 2:10 am. That text read, "Kill both of these niggas." (Sic.) Another text was sent from Mr. Brantley's 419 area code phone to Mr. Haywood's phone at 2:48 am. That text read, "I'm bouta shoot Dutch go get da sh*t and then I'ma kill both des n***** but u got to hurry up so we can get up out of here[.]" (Sic.)

---

[1] The phone was Mr. Haywood's phone, but according to Mr. Woods, Mr. Haywood let Mr. Woods use it.

{¶24} At some point, Mr. Brantley called Mr. Woods back and asked if Mr. Woods was still there and if anyone else was around. Subsequently, Mr. Brantley and Mr. Haywood came jogging up behind Mr. Woods' vehicle. Mr. Brantley got into the front passenger seat. He had with him a white t-shirt and a bag that appeared it might have about a half an ounce (14 grams) of drugs in it. Mr. Haywood got into the backseat. Mr. Woods did not know what happened to the car they came in. Mr. Woods testified that one of the two said, "Take it to our grave." Additionally, one of them threatened Mr. Woods, saying, "Take it to our grave or I'll kill you." Mr. Woods also heard Mr. Brantley say, "I doubled back to kill them." Mr. Woods then drove Mr. Haywood and Mr. Brantley to Donte's Game Day Grille and dropped them off. Mr. Woods went home and went to bed. When he woke up, he received a text from Mr. Haywood asking if Mr. Woods had told his cousin; Mr. Woods responded that he had not.

{¶25} Mr. Love testified that when he woke up the morning of April 18, 2013, he called Mr. Roberts' phone and someone else answered. Mr. Love averred that it sounded like "a black guy trying to sound white." Mr. Love hung up and tried the number again. This time a woman answered. Mr. Love thought it was Ms. Welch and proceeded to ask for Mr. Roberts. The woman indicated that he was not around. Mr. Love asked when he was expected back, and the woman responded, "Never[.]"

{¶26} Mr. Love then decided to investigate the situation. He and his wife drove to Kimlyn Circle. Mr. Love went to the apartment and found the door open, which was unusual. Mr. Love proceeded inside and called Mr. Roberts' name but there was no answer. Mr. Love then noticed a shell casing on the floor of the living room and became worried. He ran towards the front door but then noticed the basement door was open, which was also unusual. Mr. Love

found the bodies of Mr. Roberts, Mr. Delaney, Ms. Welch, and Ms. Nash in the basement.[2] After checking to see if the victims were alive, Mr. Love proceeded to leave.

{¶27} Mr. Love tried to call the police but his phone was dead. He knocked on the door of a neighbor and told the neighbor to call the police because someone killed his friend but the neighbor shut the door. Mr. Love did not want to stay at the scene in case the perpetrators were still around; so he and his wife pulled into the devil strip outside the apartment. Shortly thereafter, Mr. Love saw a police officer, flagged him down, and reported what he saw.

{¶28} The police officer, Officer Edward Patalon of the Akron Police Department, testified that around 2:30 pm on April 18, 2013, a man, later identified as Mr. Love, came running towards Officer Patalon. Mr. Love was very frantic and reported there were bodies at Kimlyn Circle, that his friend was dead, and that he was afraid someone might still be inside. Officer Patalon called for backup. Upon entering the basement of the apartment, police discovered the bodies and began to undertake an investigation.

{¶29} Detective Anna Romito of the Akron Police Department Crime Scene Unit discussed the evidence found at the crime scene. Detective Romito noted there were two snack cake boxes on the floor of the kitchen and a couple kitchen cabinets that were left open. A digital scale and paring knife were also found in the kitchen. An unspent .40 caliber round was found on the floor in the living room along with a white powder and a small amount of money. Scattered on the couch were shoes and shoe boxes. Police found a wallet, a cell phone, a drinking glass, and an ashtray with cigarette butts on tables in the living room. While a small amount (a total of about 2 grams) of a white substance that tested presumptively positive for

---

[2] Mr. Love did not notice Ms. Nash's body, which was in a corner, until he went down into the basement a second time.

heroin was found in the apartment, 30 grams were not recovered. She described the upstairs of the house as messy; however, she could not say whether that was how the apartment was normally kept or if the condition was connected to the murders. Numerous bullets and cartridge cases were recovered from the basement; most were .40 caliber, but a few were 9 mm. A cigarette butt was found near the body of Ms. Nash, and Ms. Nash's keys were found in her hand. Ms. Nash's and Ms. Welch's purses were found in the basement near them. Ms. Welch's purse contained $69. Mr. Delaney's wallet was also found in the basement.

{¶30} None of the DNA recovered from the items at the crime scene was consistent with Mr. Brantley's or Mr. Haywood's DNA. Several samples contained insufficient DNA for comparison purposes. While over a dozen individuals' DNA was used for comparison purposes, a few of the samples nonetheless came back with profiles of unknown individuals. This included the unspent round in the living room which contained profiles of two unknown individuals. Due to insufficient data, Mr. Townsend could not be definitely included or excluded as a possible contributor to the DNA from the swab of Mr. Delaney's pants pocket.

{¶31} Dorothy Dean, M.D., a deputy medical examiner, testified about the autopsy results of the victims. Dr. Dean concluded that all of the victims died from gunshot wounds that were inflicted by another person with a handgun. Mr. Roberts had four gunshot wounds. His cause of death was gunshot wounds to the head and torso. Mr. Delaney had nine gunshot wounds. His cause of death was gunshot wounds to the head and torso. Ms. Welch had three gunshot wounds. Her cause of death was a gunshot wound to the head. Ms. Nash had a single gunshot wound to her head which caused her death.

{¶32} Lieutenant David Whiddon of the Akron Police Department testified about the investigation. He testified about the importance of cell phone records in the case and how police

came to suspect Mr. Brantley and Mr. Haywood. He indicated that police canvassed the area, but no one reported hearing any gunfire or seeing anything unusual. A neighbor of Mr. Roberts did indicate that Mr. Roberts stopped by her apartment around 2 am on April 18, 2013.

{¶33} Lieutenant Whiddon stated that no cell phones were found in the basement with the victims and, that, while two phones were found in the apartment, police believed those phones to be old phones that were not in use. Once police identified the victims, they obtained their cell phone numbers and began to subpoena records.

{¶34} Mr. Roberts' cell phone was found on April 18, 2013, in the middle of a street by a construction worker. That construction worker turned the phone into a nearby Subway restaurant. The phone was then turned into Mr. Robert's mother, who then gave it to police. Phone records revealed that the last outgoing call on Mr. Roberts' phone was to a neighbor at 1:58 am on April 18, 2013 and the last incoming call was from a number police would later identify as being associated with Mr. Haywood. Police learned from phone records that Mr. Haywood's phone was either turned off or the battery had died from the period of time after 1:42 am until 5:01 am on April 18, 2013. During that time, Shasarae[3] Johnson, Mr. Haywood's child's mother, called and texted Mr. Haywood's phone numerous times. She also contacted Mr. Brantley's and Mr. Woods' phones. From the context of the text messages, it appeared she was trying to find Mr. Haywood and was upset that he was not at home.

{¶35} After police discovered that Mr. Haywood was the last person to call Mr. Roberts, they sought to speak to him. Mr. Haywood was being held in the Summit County Jail at the time. Police interviewed him and recovered his phone. However, someone had wiped his

---

[3] Sometimes in the transcript Ms. Johnson is referred to as Shasarae and at other points she is referred to as Sharae. There is no explanation for the difference. We will simply refer to her as Ms. Johnson.

phone, i.e. reset it to its factory setting, and so no usable information was obtained from the phone itself. Nonetheless, because Verizon maintains both phone and text records for a period of time, the police were able to obtain information about Mr. Haywood's cell phone calls and texts. Once police saw the two text messages that were sent to Mr. Haywood's phone around 2 am on April 18, 2013, that discussed killing people, they began to suspect Mr. Haywood.

{¶36} Police then learned that there may have been a possible association between Mr. Haywood and Mr. Brantley, and so they also sought to interview Mr. Brantley. Mr. Brantley happened to be at the police station on April 29, 2013, to pick up Mr. Haywood, who was being arraigned. Police asked Mr. Brantley if he would consent to be interviewed and he agreed. At the time, Mr. Brantley had two phones with him, a red flip phone with a 330 area code phone number, and a white iPhone with a 419 area code number. During the interview, police came to discover that the incriminating texts sent to Mr. Haywood's phone were sent from Mr. Brantley's phone with the 419 area code. At the end of the interview, Mr. Brantley was arrested and his phones were confiscated.

{¶37} Detective Guy Sheffield from the Akron Police Department, who is involved with computer forensics, analyzed the phones. He testified about two texts that came from Ms. Johnson's phone, to Mr. Brantley's iPhone. One was from April 25, 2013 and stated, "Now they got Ronald phone?? Your number in there." The second was delivered on April 27, 2013 and read, "I talked to haze he said you and Doug need to change y'all numbers." Detective Sheffield next used special software to attempt to recover deleted text messages from the phones, as police wanted to know if the incriminating texts sent from Mr. Brantley's phone to Mr. Haywood's phone were deleted from Mr. Brantley's iPhone. The software was able to identify that the first text message that read, "Kill both of these n*****[,]" was deleted from the phone. The software,

however, could not find any remnant of the second text message. Finally, Detective Sheffield testified that Mr. Brantley's phone contained a screen capture image of an Ohio.com news article titled, "Police say four people shot in the head in the apartment complex in east Akron[.]" That image was sent from Mr. Haywood's phone to Mr. Brantley's iPhone on April 18, 2013, at 4:47 pm.

{¶38} Lieutenant Whiddon testified that there was also evidence on the two phones that connected Mr. Brantley to the two phones. There were pictures on the white iPhone of Mr. Brantley holding the red phone. Additionally, there were pictures on the white iPhone of Mr. Brantley's daughter, the mother of Mr. Brantley's daughter, and Mr. Brantley's friend, Maurice Stewart. There was also testimony that there was an outgoing message from Mr. Brantley's red phone on March 22, 2013, informing people of his new phone number, which corresponds to the number of the white iPhone. Lieutenant Whiddon also testified that the cell phone tower records[4] were consistent with the phones being used in an area that would include Kimlyn Circle during the times the incriminating texts were sent.

{¶39} Lieutenant Whiddon also testified about two calls that Mr. Brantley made from the jail after he was arrested, which were played for the jury. The first call was to his mother and the second included his mother and his friend, Mr. Stewart. While the phone calls were vague, it did appear that Mr. Brantley was attempting to have his mother and Mr. Stewart remove certain

---

[4] The individual from the Akron Police Department who mapped the cell phone records testified that the program used automatically defines a three-mile radius from the tower (thereby demarcating a possible area from which the subject call could have been made). However, testimony from the records custodians from Verizon and T-Mobile indicated that those companies' towers within the Akron area would only have a range of 250 feet to a mile, depending on the company. Accordingly, the mapping done by the Akron Police Department likely encompassed a wider area than the actual range of the towers.

items from the house, including a phone, clothes, and shoes. Mr. Brantley specifically asked Mr. Stewart to trash the "Shell Toes[,]" which were testified to as being a line of Adidas shoes.

{¶40} Police also came to discover that Ms. Welch and Ms. Nash left Dreamers with Mr. Townsend and Mr. Williams. Police interviewed both Mr. Townsend and Mr. Williams and examined their phone records. They also obtained surveillance video from Dreamers and Denny's. Lieutenant Whiddon testified that Mr. Williams' and Mr. Townsend's statements were consistent with information available from the phone records and videos, including where they said they were at various times.

{¶41} Police interviewed Mr. Woods on two occasions. The first time, Mr. Woods did not tell police what had happened because he was nervous. At the first interview he told police that he was home all night after 10 pm on April 18, 2013, and that he did not have the phone that police believed was associated with him. He also indicated that he did not know anything about the murders. However, during the second interview, Mr. Woods gave a statement that was similar to his trial testimony. Mr. Woods admitted at trial that his statements during the first police interview consisted largely of lies. The phone records for Mr. Woods' phone were consistent with his statement that he was at Gurley Avenue during the early morning hours of April 18, 2013. Phone records also confirmed that multiple calls went between Mr. Woods' phone and Mr. Brantley's and Mr. Haywood's phones during that time. There was testimony that neither Mr. Townsend nor Mr. Woods received any sort of promises or deals in exchange for their testimony at trial.

{¶42} Viewing the above evidence in a light most favorable to the State, we conclude that there was sufficient evidence whereby a reasonable jury could find Mr. Brantley guilty of the aggravated murder counts and capital specifications. Even without any eyewitness

testimony, there was substantial circumstantial evidence tying Mr. Brantley to the crimes. Mr. Woods' testimony provides evidence that Mr. Brantley and Mr. Haywood were in the area of the scene of the crime during the time of the murders and that Mr. Brantley participated in the murders in light of what Mr. Brantley told Mr. Woods upon returning to his vehicle. The cell phone records additionally evidence that Mr. Brantley was in the area of Kimlyn Circle during the relevant timeframe. Moreover, the two text messages sent from Mr. Brantley's iPhone to Mr. Haywood during the 2 am hour of April 18, 2013, provide strong circumstantial evidence that Mr. Brantley was involved in the murders. These messages said, "Kill both of these n*****[,]" and "I'm bouta shoot Dutch go get da sh*t and then I'ma kill both des n***** but u got to hurry up so we can get up out of here[.]" (Sic.) It would not be unreasonable, in light of all of the testimony discussed above, for the jury to conclude that Mr. Brantley was in possession of his phones on April 18, 2013. Additionally, Mr. Townsend indicated that, when Ms. Welch called him, she may have said that she saw "Doug" through the window. Mr. Haywood was known as Doug and Mr. Roberts was known as Dutch.

{¶43} Additionally, there was evidence of events after the murders that tended to tie Mr. Brantley to them. Mr. Haywood sent Mr. Brantley a screen shot of a news story about the murders the day they happened. Ms. Johnson sent Mr. Brantley text messages expressing concern that Mr. Brantley's information might be in Mr. Roberts' phone and suggesting that Mr. Brantley change his phone number. Mr. Brantley's phone calls from jail also tend to suggest that Mr. Brantley was trying to get people to remove items from the house and to do so quickly.

{¶44} Given the foregoing, there was sufficient circumstantial evidence from which a jury could reasonably find that Mr. Brantley was at Kimlyn Circle, that he and Mr. Haywood killed the victims, and that it was their purpose to do so. In light of the text messages Mr.

Brantley sent to Mr. Haywood, there was also evidence from which a jury could conclude that Mr. Brantley committed the murders with prior calculation and design; in other words, there was evidence that Mr. Brantley and Mr. Haywood planned to kill the victims. *See Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, at ¶ 154. Moreover, that same evidence could have reasonably allowed the jury to find that Mr. Brantley was the principal offender. *See Stojetz,* 84 Ohio St.3d at 458-459.

{¶45} We also conclude there was sufficient evidence for the jury to find that the murders were committed in the course of a kidnapping, aggravated robbery, and aggravated burglary. The bodies of the victims were all found together in the basement of the apartment at 42 Kimlyn Circle with fatal gunshot wounds. No cell phones were found in the basement with the victims; instead, Mr. Roberts' cell phone was later located in the street near a Subway. There was also evidence from which it could be inferred that drugs were taken from the apartment. Mr. Love testified that he left 30 grams of heroin in the apartment for Mr. Roberts, but only a small amount of heroin was found at the crime scene. Further, Mr. Woods testified that, when Mr. Brantley returned to the car, he had a bag with him that looked like it could have had about 14 grams of drugs. Finally, the second incriminating text message sent from Mr. Brantley's iPhone to Mr. Haywood's phone mentions that Mr. Haywood should "go get da sh*t[,]" from which it could be reasonably inferred that Mr. Haywood was to steal something.

{¶46} From the foregoing, we conclude that the State presented sufficient evidence from which the jury could find Mr. Brantley guilty of the challenged offenses. Mr. Brantley's second assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

THE VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT [OF] EVIDENCE AND, AS A RESULT, [MR.] BRANTLEY'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED[.]

**{¶47}** Mr. Brantley argues in his third assignment of error that the guilty verdicts were against the manifest weight of the evidence. Mr. Brantley does not point to any finding that he believes is unsupported by the weight of the evidence; instead, he makes a general argument concerning witness credibility and the lack of physical evidence tying him to the crimes.

**{¶48}** When a defendant asserts that his conviction is against the manifest weight of the evidence:

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶49}** To the extent that Mr. Brantley has argued that the testimony of Mr. Woods and Mr. Townsend is not credible based upon evidence not within our record, we overrule his argument for the same reasons discussed in the analysis of his first assignment of error. With respect to Mr. Woods' credibility, the jury was aware that Mr. Woods had initially provided the police with false information when he was interviewed and was able to observe him and Mr. Townsend testify at trial. We remain mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." (Citations omitted.) *State v. Bulls*, 9th Dist. Summit No. 27029, 2015-Ohio-276, ¶ 17. After thoroughly and independently reviewing the record, we cannot conclude the jury's findings and credibility determinations were unreasonable

Further, while it is true that there was no direct physical evidence connecting Mr. Brantley to the crime scene, as discussed above, there was substantial circumstantial evidence which did. Cell phone records placed Mr. Brantley's phones in the area including Kimlyn Circle around the time incriminating text messages were sent from his phone to Mr. Haywood's phone. Additionally, Mr. Woods' testimony also places Mr. Haywood and Mr. Brantley near the crime scene at the time of the murders. Finally, Mr. Woods' testimony about what Mr. Brantley said upon returning to the vehicle also supports a conclusion that Mr. Brantley participated in the murders. Given Mr. Brantley's limited argument on this issue, and our prior discussion of the evidence in this case, we overrule his third assignment of error.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN NOT SUPPRESSING THE ORAL STATEMENTS [MR.] BRANTLEY MADE TO INVESTIGATING OFFICERS WHEN UNDER THE TOTALITY OF THE CIRCUMSTANCES, HE WAS SUBJECT TO CUSTODIAL INTERROGATION AND THE INTERROGATING OFFICERS FAILED TO GIVE [MR.] BRANTLEY THE WARNINGS REQUIRED BY *MIRANDA V. ARIZONA* [], 384 U.S. 436 [(1966)], THEREBY VIOLATING HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION[.]

{¶50} Mr. Brantley argues in his fourth assignment of error that the trial court erred in denying his motion to suppress with respect to statements Mr. Brantley made during an April 29, 2013 interview at the Akron Police Department. While police did *Mirandize* Mr. Brantley towards the end of the interview, he maintains that he was in custody from the beginning of the interview and that police failed to give him *Miranda* warnings as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Thus, he argues that his statements should have been suppressed. Based on his limited argument on appeal, and because we conclude that, during the portions of

the interview at issue, Mr. Brantley was not in custody, he has failed to demonstrate the trial court erred in denying his motion to suppress.

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *Accord State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, ¶ 6 (*Burnside* applied).

{¶51} "The Fifth Amendment to the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *State v. Rafferty,* 9th Dist. Summit No. 26724, 2015-Ohio-1629, ¶ 31, quoting *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, ¶ 11. "This provision applies to the states through the Fourteenth Amendment." *Leach* at ¶ 11. "During a custodial interrogation, a suspect has the right to remain silent and to be represented by an attorney." *Rafferty* at ¶ 31, citing *Miranda* at 469. "'A suspect's right to an attorney during questioning * * * is derivative of his [or her] right to remain silent * * * [,]' under the Fifth Amendment." *Rafferty* at ¶ 31, quoting *Leach* at ¶ 13, quoting *Wainwright v. Greenfield*, 474 U.S. 284, 298-299 (1986) (Rehnquist, J., concurring). "When a person is subject to a custodial interrogation, he must be informed of his rights to remain silent and to an attorney." *Rafferty* at ¶ 31, citing *Miranda* at 469.

{¶52} "The *Miranda* right to counsel attaches only when the individual is subject to a custodial interrogation." (Emphasis omitted.) *Rafferty* at ¶ 32. "[A] police officer may continue to question a suspect in a noncustodial situation, even if the suspect has made a request for counsel, as long as the officer's persistence in questioning does not render statements made by

the suspect involuntary[5]." (Footnote added.) *Rafferty* at ¶ 32, quoting *State v. Fry*, 61 Ohio App.3d 689, 692 (9th Dist.1988).

{¶53} "Custody for purposes of entitlement to *Miranda* rights exists only where there is a restraint on freedom of movement of the degree associated with a formal arrest." (Internal quotations and citations omitted.) *Rafferty* at ¶ 32. "Whether a suspect is in custody depends on the facts and circumstances of each case." (Internal quotations and citations omitted). *State v. Lerch,* 9th Dist. Summit No. 26684, 2013-Ohio-5305, ¶ 8. "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." (Internal citations and quotations omitted.) *Id.* "The test is whether, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave." (Internal quotations and citations omitted). *Id.*

{¶54} The video recording of the police interview of Mr. Brantley was admitted into evidence at the suppression hearing, as was a transcript of that recording. At the suppression hearing, Detective John Bell of the Akron Police Department testified that, while investigating the murders, the police received several tips, some of which included nicknames of people that the police might want to investigate. These nicknames included "Buck" and "Dougie[,]" who became persons of interest. On April 29, 2013, Detective Bell was on the seventh floor of the police station after returning from escorting a prisoner to felony court when he heard someone call out "Buck[.]" Mr. Brantley, who was at the police station to post bond for his friend, Mr.

---

[5] We note that Mr. Brantley has not argued on appeal that his statements were involuntary.

Haywood, in an unrelated case, responded to the person.    Detective Bell approached Mr. Brantley and said, "[W]e need to talk to you about * * * an investigation."  Mr. Brantley, who was with at least one other person at the time, agreed to go with Detective Bell to the sixth floor detective bureau.  The person or persons accompanying Mr. Brantley were allowed to wait for him on a bench on the sixth floor.

{¶55}  Detective Bell, who had a firearm on his person, and another officer escorted Mr. Brantley to an interview room.  Detective Bell frisked him for officer safety, and initially took Mr. Brantley's money and cell phones from him.  Detective Bell indicated that the cell phones were taken from Mr. Brantley to keep him from being distracted.  Mr. Brantley's belongings were placed in a cabinet right outside the interview room.  While there were handcuffs in the room, Mr. Brantley was not handcuffed.

{¶56}  Detective Bell then left the room to inform Detective Richard Morrison about Mr. Brantley's presence.  Shortly thereafter, Detective Bell returned and gave Mr. Brantley back his money.  Detective Bell proceeded to ask Mr. Brantley for some identifying information and information about his cell phones.  The video recording reveals that, at the time, the door to the interview room was open.  As Detective Bell was about to leave the interview room, Mr. Brantley asked if he could use his phone to call his lawyer.  Detective Bell asked him who his lawyer was, Mr. Brantley replied, and Detective Bell said, "Okay, hold on a second."  Detective Bell left and shut the door behind him.  When Detective Bell returned, Detective Morrison was with him and Mr. Brantley's request to speak to his attorney was not brought up by either the detectives or Mr. Brantley again until Mr. Brantley was read his *Miranda* rights at the end of the interview.

**{¶57}** Detective Morrison also testified at the suppression hearing. He indicated that, prior to the interview, he knew that Mr. Brantley went by "Buck[,]" due to Detective Morrison's involvement in a prior case involving Mr. Brantley. Thus, he believed that Mr. Brantley was probably the "Buck" the police were looking for concerning the murders at issue in this case. Additionally, prior to the interview, Detective Morrison knew that Mr. Haywood had called Mr. Roberts the night of the murder and that there were incriminating text messages sent between Mr. Haywood and another person. Detective Morrison believed that other person was Mr. Brantley.

**{¶58}** When Detective Morrison began interviewing Mr. Brantley, he told him that, "[Y]ou're not under arrest for anything. If you want to leave, you can leave when we're talkin' okay." He also told Mr. Brantley that he just wanted to have a "casual conversation[.]" During the interview, Mr. Brantley is asked numerous questions about cell phone numbers, including his own, as well as those of others. Additionally, he is asked about the murders: what and when he heard about them and where he was during the timeframe involved. Mr. Brantley does not at any point confess to the murders. Due to the number of questions related to cell phone numbers, for a large portion of the interview, the detectives returned Mr. Brantley's phones to him. However, at one point, when one of Mr. Brantley's phones rang, he was instructed not to answer it.

**{¶59}** Later in the interview, Detective Morrison confronted Mr. Brantley with text messages that were sent from one of his phones to Mr. Haywood's phone (whom Mr. Brantley identified as "Dougie") around the time of the murder. Two of the text messages discussed killing people. Mr. Brantley denied his involvement and claimed he did not send the texts. Detective Morrison told Mr. Brantley several times that, no matter what he said, he was still going to leave that day and that he was not going to be arrested. A short time later, Mr. Brantley

refused to answer any more questions and told the detectives if they thought he did it, they should take him into custody. Mr. Brantley was subsequently *Mirandized* and ultimately placed under arrest.

{¶60} While we acknowledge there are several facts regarding the interview that give us pause, ultimately, in evaluating the totality of the circumstances, we conclude that Mr. Brantley was not in custody prior to being *Mirandized.* Certainly the facts that Mr. Brantley was frisked and his cash and phones were initially taken from him are factors that would favor a finding that Mr. Brantley was in custody, as does the fact that Mr. Brantley was ultimately arrested at the end of the interview. *See United States v. Protsman,* 74 Fed.Appx. 529, 534 (6th Cir.2003), citing *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (factors suggest suspect is not in custody when he is informed that he is not under arrest, is subjected to a brief interview, and is allowed to leave at the completion of the interview). However, near the beginning of the interview, Mr. Brantley's cash was returned to him and he had access to his cells phones for a good portion of the interview while the detectives were in the room with him. While there is a suggestion that Mr. Brantley may not have been able to freely use his cell phones during the interview given that he was instructed not to answer the phone when one of them rang, Mr. Brantley did not ask to use the phones when they were returned to him. Mr. Brantley was not handcuffed during the interview, *see United States v. Malcolm,* 435 Fed.Appx. 417, 421 (6th Cir.2011) (fact that suspect was not handcuffed weighs against being in custody), and while Detective Bell had a holstered handgun on his person, he never pointed it at Mr. Brantley or threatened him with it. *See State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 99 (noting that even if officers were armed that fact would not measurably strengthen argument that defendant was in custody when there was no contention that the officers displayed the weapons in a threatening manner).

{¶61} During the course of the interview, prior to the issuance of *Miranda* warnings, Mr. Brantley never requested to leave, and the detectives never told Mr. Brantley that he was under arrest or that he could not leave. In fact, near the beginning of the interview, Detective Morrison specifically told Mr. Brantley that he was not under arrest and that, if he wanted to leave, Mr. Brantley could leave while they were talking. Later in the interview, Detective Morrison repeatedly told Mr. Brantley that he would be leaving the police station that day irrespective of what he said. *See Malcolm* at 421 (fact that defendant told he could leave and was not under arrest weighs against being in custody). While the door was closed most of the time while the detectives were with Mr. Brantley, it did not appear to be locked in that the detectives merely turned the handle of the door to exit. It is unclear whether the door was locked during the periods when Mr. Brantley was left alone in the room.

{¶62} Further, while the interview took place at the police station, it did so because Mr. Brantley was already at the police station on unrelated business when the police stopped him and sought to interview him. *See State v. Malone,* 5th Dist. Licking No. 14CA89, 2015-Ohio-3436, ¶ 25 (fact that defendant drove himself to the police station weighed against being in custody). According to Detective Bell, Mr. Brantley agreed to go with Detective Bell. The person or persons with Mr. Brantley were allowed to wait outside the detective bureau on a bench, which would also favor the conclusion that Mr. Brantley was not in custody. Moreover, Mr. Brantley has not argued that the length of the interview weighed in favor of a finding of custody; approximately an hour and a half elapsed from the point in time that Mr. Brantley entered the interview room until the point in time he was read his *Miranda* rights, and substantial portions of that time involved Mr. Brantley sitting alone in the interview room waiting for the officers. *See Malone* at ¶ 25 (concluding that the fact that interview lasted 90 minutes weighed against

defendant being in custody); *State v. Isacc,* 2d Dist. Greene No. 2003-CA-91, 2004-Ohio-4683, ¶ 23 (Defendant not in custody when, inter alia, the interview "lasted only two hours").    Finally, Mr. Brantley has not argued that the detectives engaged in any inappropriate or intimidating interview tactics, nor did we observe any in viewing the video of the interview.

**{¶63}**  We are mindful that the United States Supreme Court has stated that questioning of a suspect at a police station does not inherently require a conclusion that the defendant was in custody:

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment."  Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.  But police officers are not required to administer *Miranda* warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."  It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason,* 429 U.S. at 495.

**{¶64}**  After considering all of the circumstances of this case and the limited argument of Mr. Brantley we cannot conclude that the trial court erred in concluding he was not in custody during the relevant time frames of the interview.  As Mr. Brantley's argument on appeal is limited to only challenging this conclusion, we overrule his fourth assignment of error.

### ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE CUMULATIVE AND GRUESOME PHOTOGRAPHS OF THE VICTIMS ALL IN VIOLATION OF [MR.] BRANTLEY'S RIGHTS TO A FAIR TRIAL AS PROTECTED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION[.]

{¶65} Mr. Brantley asserts in his fifth assignment of error that the trial court erred in admitting cumulative and gruesome photographs of the victims.

{¶66} "Under Evid.R. 403(A), a trial court must exclude evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.' Under Evid.R. 403(B), a trial court may exclude evidence 'if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.'" (Emphasis omitted.) *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 95, quoting Evid.R. 403.

{¶67} "In the context of capital trials, however, [the Supreme Court of Ohio has] established a stricter evidentiary standard for admitting gruesome photographs and ha[s] strongly caution[ed] judicious use." (Internal quotations and citations omitted.) *Mammone* at ¶ 96. "A gruesome photograph is admissible only if its probative value * * * outweigh[s] the danger of prejudice to the defendant." (Internal quotations and citations omitted.) *Id.* "Unlike Evid.R. 403, which turns on whether prejudice substantially outweighs probative value, this standard requires a simple balancing of the relative values of prejudice and probative value." (Internal quotations and citations omitted.) *Id.* "And even if a photo satisfies the balancing test, it can be neither repetitive nor cumulative in nature." (Internal quotations and citations omitted.) *Id.* "A trial court's decision that a photo satisfies this standard is reviewable only for abuse of discretion." *Id.* "The term gruesome in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts." (Internal quotations and citation omitted.) *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 141.

{¶68} At trial, Mr. Brantley only objected to the admission of three photographs that were part of State's exhibit 89, which was a group of PowerPoint slides of the crime scene. The

photographs Mr. Brantley objected to were labeled UUU, FFFF, and GGGG. When renewing his objection at the end of trial, he noted that he was objecting to them because they were "very graphic and highly prejudicial."

{¶69} Photograph UUU depicts the upper body of Mr. Delaney. There appears to be a wallet in his left hand. There is blood staining items under his head and blood coming from his nose, eyes, and mouth. It is undoubtedly a gruesome photograph. Photograph FFFF depicts Ms. Nash. She is wearing a hoodie that covers her head, and the only skin visible is Ms. Nash's fingers. However, her head is surrounded by a large amount of blood and a bullet hole is visible in her hoodie. Photograph GGGG depicts a close-up of the FFFF photograph. There is no skin visible, as Ms. Nash's head is covered with a hoodie. Detective Romito testified that that photograph demonstrated staining around the bullet hole called soot, which usually evidenced that the weapon was fired from a closer range, although the actual distance could not be determined.

{¶70} We conclude that the probative value of the photographs outweighed any prejudicial impact. The crime scene was graphic. Four bodies were discovered in the basement, each having at least one gunshot wound. Mr. Delaney was shot nine times. Accordingly, the crime scene was inherently gruesome. Additionally, numerous bullets, fragments, and casing were scattered throughout the basement that all had to be documented. The photographs illustrated Detective Romito's testimony and gave the jury an appreciation of the nature and circumstances of the crimes. *See State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 115. Moreover, we remain mindful that it is the State that "must prove, and the jury [that] must find, that the killing was purposely done. The number of shots fired, the places where the bullets entered the body, and the resulting wounds are all probative evidence of a purpose to cause

death." *State v. Maurer,* 15 Ohio St.3d 239, 265 (1984), quoting *State v. Strodes,* 48 Ohio St.2d 113, 116 (1976); *see also Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 99.

{¶71} To the extent Mr. Brantley is attempting to challenge the admission of any photographs not objected to, he is limited to arguing plain error. *See State v. Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 132. However, as Mr. Brantley has not developed a plain error argument on appeal, we decline to construct one for him. *See State v. Wallace,* 9th Dist. Lorain Nos. 14CA010609, 14CA010610, 2015-Ohio-4222, ¶ 20. Further, we note that, while Mr. Brantley has argued on appeal that the photographs were cumulative and repetitive, it does not appear that such was the basis of his objection below; instead, it appears that, at trial, Mr. Brantley objected to the photographs because of their graphic nature. Accordingly, to the extent Mr. Brantley raises the issue of whether the photographs were cumulative or repetitive, he has forfeited that issue and has failed to argue plain error on appeal. *See State v. Maple,* 9th Dist. Summit No. 25313, 2011-Ohio-1216, ¶ 12.

{¶72} Nonetheless, even if we were to address this argument on the merits, we would overrule it. Mr. Brantley's argument is based solely on the fact that there were over 100 slides in the exhibit containing the crime scene photographs. "While it is true that the sheer number of photographs admitted may constitute error where they are needlessly cumulative, * * * the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby. Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." (Internal citations and quotations omitted.) *State v. Smith,* 80 Ohio St.3d 89, 108-109 (1997). Here, a large portion of the slides were photographs of other parts of the house, and thus, did not contain images of the bodies of the deceased. Additionally, there were a number of photographs of the

basement that were taken after the bodies were removed from the scene. Given Mr. Brantley's limited argument on the issue, *see* App.R. 16(A)(7), he has not convinced us that any reversible erred occurred in the admission of the photographs.

{¶73} Mr. Brantley's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

A DEFENDANT'S RIGHT TO A FAIR TRIAL IS VIOLATED WHEN A TRIAL COURT FAILS TO GRANT A MISTRIAL WHEN THE ENDS OF JUSTICE REQUIRED IT AND A FAIR TRIAL WAS NO LONGER POSSIBLE[.]

{¶74} Mr. Brantley argues in his sixth assignment of error that the trial court erred in failing to grant a mistrial on the two occasions in which spectators reacted to photographs displayed during trial. We do not agree.

{¶75} "Whether an emotional demonstration in the courtroom during the course of a murder trial by a spectator related to the victim improperly influences the jury against the accused[,] * * * constitute[s] misconduct so as to deprive the accused of a fair trial * * * [is a question] of fact to be resolved by the trial court, whose determination thereon will not be disturbed on review in the absence of evidence contrary to that determination clearly and affirmatively appearing on the face of the record." *State v. Morales,* 32 Ohio St.3d 252, 255 (1987), quoting *State v. Bradley,* 3 Ohio St.2d 38 (1965), syllabus. "Absent clear evidence in the record that the outburst improperly affected the jury, only the trial judge can authoritatively determine whether the jury was disturbed, alarmed, shocked or moved by the demonstration or whether the incident was of such a nature that it necessarily influenced the ultimate verdict of conviction." *Morales* at 255. "The answer to those questions invariably depends upon facts and circumstances which a reviewing court cannot ordinarily glean from the record." *Id.*

{¶76} The first emotional outburst occurred during the State's opening statement while the State was displaying graphic photographs of the deceased victims. The record reflects that family members of the victims began to cry when photographs of their bodies were displayed. At that point, the trial court had the jury exit the courtroom and spoke to the gallery. The trial court explained that the spectators could not display emotion as the trial court could not allow the jury to be influenced by the natural display of grief. The trial judge then requested that those members of the gallery who had interrupted the proceedings step out of the courtroom while the graphic evidence was being displayed. The trial court then asked that the State inform the court prior to displaying any graphic images so that the court could ask those who might be upset to step outside. Thereafter, defense counsel moved for a mistrial, which was denied. When the jury returned, the court instructed the jury:

> Ladies and gentlemen, I want to instruct you that as you can imagine, the difficulties, some of the people in the spectators are representative and family members of some of the victims.
>
> I think we can all appreciate the difficulties that * * * those people are experiencing as they sit through this trial, hear the evidence and certainly then see some of the photographic evidence.
>
> However, I am going to instruct you and I'm going to instruct you over and over and over, and at the end the same thing, that this case is to be decided on the evidence, on the facts that come into this courtroom as well as on the law that I will give you that will apply to those facts.
>
> And the case – sympathy is a normal human emotion, but as jurors under your oath you are going to be asked to set aside your sympathy and decided this case on the evidence and the law, okay?
>
> So throughout the proceedings there may be times that some of the spectators become overwhelmed with emotion, and I'm going to ask you to do a very difficult thing and that is to set that aside, and you must act as though you didn't hear and you didn't see it, because it may not in any way influence your verdict, okay?

{¶77} The second outburst occurred during the testimony of Dr. Dean, the medical examiner, while she was discussing the autopsy results of Mr. Delaney. Prior to the beginning of Dr. Dean's testimony, the trial court instructed the jury and the gallery that the testimony would include autopsy photographs, some of which could be graphic. During that testimony, Mr. Delaney's father became upset and stormed out of the courtroom into the hallway where he could be heard "wailing[.]" A few other spectators also became upset and ran out of the courtroom. The trial court then instructed the jury to take a break.

{¶78} When the jury returned to the court following the outburst, the trial court instructed the jury again, saying:

> Ladies and gentlemen of the jury, I want to tell you once again that you may not allow yourselves, and I'm going to repeat this again at the end of the case, you may not allow yourselves to be influenced by either sympathy or prejudice.
>
> I understand, and I think we all understand, that some of the family members of the victims find this to be extremely emotional, and I have explained to the folks in the gallery that we do have to – the jury is going to have to decide this case on the evidence and the law, apply the two together, and you are going to be strictly instructed to disregard your feelings of sympathy and prejudice.

{¶79} At the end of Dr. Dean's testimony, Mr. Brantley's counsel renewed his motion for a mistrial. The trial court denied the motion. In doing so, the trial court noted that it had asked Mr. Delaney's father to not return to the courtroom the next day and had given a curative instruction. The State also discussed its efforts to ensure the spectators who were causing the disturbance were escorted to another floor to avoid contact with the jury.

{¶80} The trial court did not abuse its discretion in failing to grant a mistrial. Nothing in the record demonstrates that the outbursts had any effect on the jury. *See Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, at ¶ 127. "Additionally, the trial court's admonitions focused the jury on the evidence and away from the outburst." *Id.* "A jury is presumed to follow the trial

court's instructions, and Mr. [Brantley] has not pointed to anything in the record that indicates that the jury failed to do so." *State v. Jackson,* 9th Dist. Summit No. 27479, 2015-Ohio-5096, ¶ 39, quoting *State v. Boden,* 9th Dist. Summit No. 26623, 2013-Ohio-4260, ¶ 38. Moreover, the trial court warned spectators and the jury about the nature of the evidence after the first outburst. It was only after one spectator could not maintain his composure a second time that the trial court asked him not to return to court until after the next day's testimony. We see nothing unreasonable in the trial court's conduct or its decision to deny the motions for a mistrial.

**{¶81}** Mr. Brantley's sixth assignment of error is overruled.

III.

**{¶82}** The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT

SCHAFER, J.
<u>CONCURS.</u>

CARR, P. J.
<u>CONCURRING IN JUDGMENT ONLY.</u>

{¶83} I concur in the judgment but write separately with respect to the fourth assignment of error. Mr. Brantley did not identify in his motion to suppress, at the suppression hearing, or on appeal, any incriminating or inculpatory statements that he made during police questioning. I would affirm on that basis.

<u>APPEARANCES:</u>

DONALD R. HICKS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.